**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Cheryl J. Anderson, f/n/a Cheryl J. McCormick a/k/a C.J. McCormick, as beneficiary under the C.J. McCormick Trust a/k/a C.J. McCormick Equity Trust, | ) ) ) ) ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No.4:04-cv-052 |
| Gary P. Sullivan and Nancy Sullivan, | ) ) | |
| Defendants. | ) | |

The above entitled matter was tried to the court on July 31 – August 4, 2006 in the United States Federal Court, Minot, North Dakota. Plaintiff appeared in person and was represented by attorneys Charles L. Neff and Lavern C. Neff, Williston, North Dakota. Defendants appeared in person and were represented by attorneys Rebecca S. Thiem and James S. Hill, Bismarck, North Dakota. Based on the evidence introduced at trial and considering the various pre-trial and post-trial briefs filed by the parties, the court makes the following Findings of Fact, Conclusions of Law, and Order.

**FINDINGS OF FACT**

**Background re the parties and the Trust**

1.      Plaintiff Cheryl J. Anderson, f/n/a as Cheryl J. McCormick, ["Anderson"] was born on June 22, 1954, and is the great, great granddaughter of Cyrus McCormick, the inventor of the reaper. Anderson had a troubled upbringing. Her father passed away when she was four and her

1

mother, who had an alcohol problem, when she was seventeen.  By age nine, Anderson was placed in foster care by state authorities where she remained until she turned eighteen.

Anderson never graduated from high school, but later became qualified as a certified nursing assistant and at times has worked administering care to the elderly in their homes.

2.      Defendant Gary Sullivan ["Sullivan"] was born in 1940, making him approximately 15 years older than Anderson.  After spending time in the Armed Services, Sullivan held a variety of jobs including managing a restaurant, working as an insurance agent, working in the information department for North American Aviation, and working as an administrative technician for the California National Guard.  He later attended college and eventually enrolled in law school.  While in law school, Sullivan was diagnosed as having muscular dystrophy.  Nevertheless, after taking some time off to decide whether or not to pursue a law career given his disease, he graduated in 1978 in the top five percent of his class and began practicing law in California in the areas of family law and personal injury.  He also became a member of a national Christian legal society.

Sullivan married his current spouse, co-defendant Nancy Sullivan, in 1970.  This was the second marriage for both of them.

3.      Anderson was the beneficiary of a family trust during her youth.  In 1975, shortly before her twenty-first birthday, Anderson established a living trust naming herself as the sole beneficiary by executing a trust instrument that was filed for record in Napa County, California, on March 14, 1975.  The formal name of the trust is the "C.J. McCormick Equity Trust."  It is sometimes known simply as the "C.J. McCormick Trust" and will be referred to herein as the "Trust."

4.      Merle Rex Turner and Charles A. Duggan were the first named trustees.  Initially, the primary corpus of the Trust consisted of two natural gas wells located near Rio Vista, California, and an undeveloped tract of land near Fort Bragg, California.  Over the years, the royalty income from the natural gas wells has been the primary source of current income for Anderson and her family.

5.      In the late 1970's Anderson married Allen Barker, her second husband, and they became co-trustees of the Trust, replacing the two original trustees.  Anderson separated from Barker in October 1985 after having become a victim of domestic violence.  Needing help, she was referred by a local bank teller to Sullivan, whom the teller identified as being a "Christian attorney."

Religion was, and still is, a big part of Anderson's life and it has helped her get through a number of  troubled times.   In seeking Sullivan's assistance, Anderson was comforted by the fact that he held himself out to be a religious person.  Sullivan's telephone listing, which Anderson consulted prior to retaining him, contained a religious "agape" symbol.  And, at the conclusion of their first meeting, Sullivan and Anderson prayed together - a practice that they regularly continued over the years when they would meet in person or talk over the phone.

One of the first things Sullivan did was to arrange temporary shelter for Anderson and her son with an acquaintance of Sullivan, Mr. Herrera.  He then represented Anderson in her divorce action.

**Sullivan's early involvement with the Trust**

6.      As part of his divorce representation, Sullivan assisted Anderson in disengaging Barker from the Trust.  In November 1985, Sullivan drafted a resolution that was signed by

3

Anderson and Barker naming Sullivan as an additional trustee.  Later, Barker was removed and Anderson requested that Sullivan continue as co-trustee to assist her in managing her affairs.  At that point, Anderson had no other family or friends she could rely upon.

7.    In October 1986, Sullivan and Anderson, as co-trustees, initiated an action against Barker for misappropriating Trust assets during the time Barker was a co-trustee.  In particular, the complaint prepared by Sullivan sought an accounting, restoration of Trust property, imposition of a constructive trust over property purchased with Trust funds, and damages to compensate for the "misapplied, misappropriated, co-mingled, or converted trust property."  Ironically, this is the same relief that Anderson now seeks from Sullivan, and which Sullivan argues is not legally available for one reason or another.[1]

8.    In 1987, Anderson remarried to Lloyd Anderson, her second cousin, who, like Sullivan, is older than Anderson.   Anderson never trusted Lloyd to take care of her finances, so the marriage did not impact Sullivan's management of the Trust's financial affairs.

**The intervention of the bankruptcy and Sullivan's resumption of his trustee duties**

9.    Sullivan's management of the Trust's financial affairs was interrupted when the Trust was pulled into a bankruptcy proceeding involving Anderson and her ex-husband Barker in the latter part of the 1980's, which had been ongoing prior to their divorce.  The bankruptcy proceeding was initiated largely because of a failure to pay income taxes on Trust income during the early years of the Trust prior to 1985.

---

[1]  For example, Sullivan now appears to argue that Anderson had a duty, essentially, to protect herself since she was a co-trustee as well as the beneficiary, and that this somehow exonerates him.  Anderson, however, was also a co-trustee with Barker, and this fact did not discourage Sullivan from filing the 1986 lawsuit seeking the same relief Anderson now seeks.   While Sullivan is obviously not bound by the position he took in 1986, the fact of the matter is that he was right then and not now, and the 1986 lawsuit demonstrates he was fully aware of his trust responsibilities during the time periods relevant to this action.

Although financial management of the Trust shifted to the bankruptcy trustee for a period of time, Sullivan remained involved, at least to some extent, and participated in a settlement with the IRS that resulted in the Trust's dismissal from the bankruptcy in late 1991.[2]  Under the settlement, the federal tax liens remained in place and a repayment plan was agreed to.

10.     Upon dismissal of the Trust from bankruptcy, Sullivan, who was still a co-trustee, resumed his active financial management of the Trust.  Initially, Sullivan made a  few payments to the IRS pursuant to the agreement that resulted in the Trust's dismissal.  However, a decline in income from the gas wells soon resulted in a cessation of payments because of Anderson's need for the funds to pay living expenses.  At that time, this exposed her to future action by the IRS, not only as to the delinquencies for the tax years prior to 1985, but also with respect to an additional assessment that was made for the tax year 1987 for interest and penalties while she was in bankruptcy.

11.     By the time Sullivan resumed his active management of the Trust, he had quit practicing law full time finding it was too taxing given his disease.  However, he continued to handle a few still-pending personal injury cases and kept his California bar license active until 1992.

**Sullivan moves to Williston in 1992**

12.     In 1992, the Sullivans moved from California to Williston, North Dakota, to be near Sullivan's daughter and her family, who were residing in Williston.  Also, at about the same time, the Andersons moved from California to Medford, Oregon.  Yet, despite the distances, Sullivan continued to manage the financial affairs of the Trust, and he eventually opened an account at the

---

[2]  The credible evidence is that the Trust was dismissed from the bankruptcy in December 1991.  One of the exhibits (if accurate) indicates the bankruptcy proceeding continued for several years after the Trust was dismissed.  If so, this was probably only as to Barker since it appears Anderson was also dismissed without obtaining a discharge at the same time as the Trust.

Gate City Bank in Williston to handle the Trust's funds, but continued to also utilize the California account for a period of time.

As covered in more detail later, the Sullivans purchased a condominium in Florida in 2001 and later that year moved there permanently. Also, about the same time, Sullivan purchased the Culligan franchise in Williston for the Trust, and in 2002 convinced the Andersons to move to Williston to operate the business. In the process, the Andersons bought the Sullivans' house in Williston, which was vacant as a result of their move to Florida.

Sullivan continued to manage the financial affairs of the Trust from Florida until the spring of 2004, when the relationships between Anderson and the Sullivans blew up and this action was commenced. What is notable about this history is that from 1992 until Sullivan was removed as a trustee in 2004, the Sullivans and the Andersons never resided in the same state.

**Additional details re the Trust relationship**

13.     Anderson is by no means incompetent, but she has trouble managing money. She also is a vulnerable person who is easily led by others and has trouble saying "no."

The document creating the Trust states that affirmative action will be taken by a vote of the co-trustees and that minutes be kept documenting the actions taken. Presumably, however, the affirmative action could include delegations of authority to the respective trustees as to the handling of certain matters. Further, the Trust document contains provisions for the appointment of officers that are necessary for the proper functioning of the Trust, and, presumably, this could include appointment of one of the trustees to act as the Trust's financial manager.

In this case, it does not appear that these formalities were ever followed. However, the evidence is that Sullivan and Anderson reached a *de facto* accommodation pursuant to which

Sullivan assumed the responsibility for the day-to-day financial management of the Trust without the necessity of prior consultation with Anderson.  This included collecting the royalty payments from the two natural gas wells, maintaining the bank accounts into which the payments were deposited, issuing checks to Anderson for her living and other expenses, and making investment decisions with respect to the Trust property - all subject to Anderson having the right to voice her disapproval or to become more involved with respect to particular matters if she chose to do so.

Pursuant to this accommodation, Anderson entrusted Sullivan with substantial discretion and authority.  In fact, during the entire time that Sullivan managed the financial affairs of the Trust, the evidence is that Anderson never became a signatory on any of the Trust's bank accounts, which left Sullivan as the only person with the power to make withdrawals and write checks.  Further, the evidence is that Anderson was never provided with any of the Trust's bank statements.[3]

This "hands-off" state of affairs, however, was what Anderson wanted.  It was not until the 2003-2004 time frame that she started questioning Sullivan's management of the Trust.  Prior to that time, she never  pressed Sullivan for any details regarding the Trust's finances and acquiesced to his unilateral handling of the Trust's financial affairs.

The blind faith that Anderson placed in Sullivan appears to have been the result of a combination of factors:  the close friendship she developed with Sullivan and his wife;  Sullivan's comforting and fatherly manner - he essentially became a father or older-brother figure to Anderson; the parties' deeply-held religious beliefs; the fact that Sullivan appeared to be a person of trust given that he was not just an attorney, but a "Christian attorney;" and Anderson's passive personality.

---

[3] Anderson claims that Sullivan was *de facto* the  "managing trustee" for the Trust.  While that description may not be apt in all circumstances, since there were infrequent occasions when Anderson acted on her own as co-trustee or together with Sullivan, it comes close to describing the accommodation reached by Sullivan and Anderson with respect to the handling of the Trust's affairs.

14.     During the entire time period that Sullivan managed the financial affairs of the Trust, he never charged Anderson for his work even though Anderson, at times, could be demanding and insistent upon immediate personal attention.  For example, there were a number of occasions when Sullivan would have to wire, or send money by Fed Ex, to Anderson when she needed it on short notice.  And, there were times when Sullivan permitted Anderson to charge to his personal credit card when there was not sufficient funds in the Trust account for what she needed.  Further, in addition to just being a financial manager, Sullivan was a close confidant and advisor to Anderson on personal matters, and she confided things in him that she would not discuss with her husband.

Sullivan's motivation in doing all of this without current remuneration appears to have been, in part, the enjoyment and satisfaction he obtained in helping other people, and, perhaps, also of having other people being dependent upon him.  This is evidenced by Sullivan's interactions with Anderson and the assistance he provided over the years to other family, friends, and former clients. Nevertheless, Sullivan hoped that Anderson would eventually provide some compensation for his efforts.  Further, the fact he had never charged for his work appears to have helped justify in his own mind the use of the Trust's funds for his own benefit.  At one point in his testimony, Sullivan, quite tellingly, stated he was confident Anderson would have approved his personal uses of the Trust funds had he asked her.

15.     Sullivan testified that he had general conversations with Anderson after he resumed financial management of the Trust in 1992 regarding the following goals for administration of the Trust:  (1) provide Anderson with sufficient funds for living expenses for her and her family;  (2) invest any excess funds so that there would be resources available to cover times when the royalty income may be insufficient to cover her daily expenses; (3) protect the Trust assets from levy by the

IRS on the outstanding tax liabilities; and (4) develop a strategy for approaching the IRS to negotiate a resolution of the outstanding liabilities.   The court believes that conversations along these lines took place and that Anderson believed Sullivan was at all times acting in her best interests.  Further, it also appears that Sullivan's concern for Anderson's welfare was genuine and that over the years he provided substantial assistance and considerable emotional support, but, unfortunately, the readily available Trust funds were too much of a temptation.

As outlined in more detail below, Sullivan converted Trust funds for his own use, but with the intent of later making reimbursement.  Also, he entered into certain transactions with family and friends on behalf of the Trust that, at the very least, are questionable as to whether he was acting in Anderson's best interests.

**Sullivan begins his internet access business - DIA**

16.     In 1994, Sullivan and three other individuals started a company to provide internet access in the Williston area.  They each invested $1,000 and formed a corporation.  Soon afterwards, Sullivan bought out one of the investors for $1,500 and a year later the other two for $5,000 each. Eventually, he converted the business to a sole proprietorship, which was known as Gary Sullivan d/b/a Dakota Internet Access ("DIA").  Also, Sullivan bought a computer store, which he called Micronet, and which he operated as a part of DIA.

17.     In addition to operating these businesses, Sullivan continued to work in a legal capacity after moving to Williston.  In 1994, he was appointed by the Fort Peck Tribal Council to be a judge on the Fort Peck Tribal Court of Appeals, which was a part-time position, and he continued to serve on that court for the next ten years, becoming its chief justice in 1998.

18.     Finally, in addition to managing the Trust's financial affairs, he actively managed another trust known as the Ruth Garcia Trust.

**Creation of the Trust's electronic  "Quickbooks" records**

19.     Sullivan testified that he kept written registers of the Trust's activity along with other manual documents.  In 1999, Sullivan hired  a college student, Sarah Francetich, to work summers inputting historical data from a box of manual records for the Trust into a computer accounting program called "Quickbooks," along with performing other work unrelated to the Trust.  Francetich had no accounting experience.  Sullivan's plan was to have her input the data and then turn the records over to a CPA for further work.

After Sullivan moved to Florida in late 2001, he hired a bookkeeper there to help with the Trust's activities.   It appears this accountant continued with the Quickbooks accounting on a contemporaneous basis because the printouts received as exhibits include entries for transactions occurring after Francetich had completed her work and Sullivan had moved to Florida.  Also, several of the printouts received as exhibits include a number of entries that are an attempt to reconcile  and correct other entries.  It is not clear from the evidence when these entries were made or by whom.[4] When Sullivan was terminated as a Trustee, it appears that the Quickbooks records were still a work-in-progress and their accuracy had not been verified by a professional accountant.

20.     The court has viewed the Quickbooks data with caution because of Francetich's lack of accounting experience and the other evidence of its development. This being said, the Quickbooks records are the only accounting records left that Sullivan maintained for the Trust.  Consequently,

---

[4]  However, if Francetich had as little accounting experience as Sullivan claims, it seems most probable that either Sullivan assisted her with the reconciling entries or they were made by the Florida bookkeeper.

he must bear the consequences of any imprecision resulting from the court's consideration of the data.[5]

**Sullivan's use of Trust funds to make loans to family and friends**

21.     On a number of occasions, Sullivan loaned Trust funds to family and friends, including  particularly the following transactions:

- "<u>Al Herrera Loan</u>."   Sullivan made an unsecured loan of $1,000 to Al Herrera in May 1994 to assist his purchase of an automobile.  This is the same person who temporarily sheltered Anderson in 1985 when she separated from Mr. Barker.

- "<u>Joe Whalen Loan</u>."   Sullivan made an unsecured loan of $3,500 in 1997 to his stepson Joe Whalen to assist his purchase of an airstream trailer.  Whalen signed a promissory note that provided for payment of 10% interest and monthly payments of  principal and interest of $307.71, until the loan was satisfied.  At that rate, the loan should have been paid off in about a year.  The evidence presented at trial, however, indicates that payments were not made in accordance with the agreed upon schedule and that the only documented repayments were: July 10, 1987, in the amount of $350.00; January 5, 1998, in the amount of  $350.00;  and January 7, 1999, in the amount of  $1,500.  At this point, it cannot be determined whether or not the Joe Whalen Loan was fully repaid.  Later, a financial statement from the Trust's Quickbooks records show a balance owing the Trust of $1,800, but the Quickbooks records are not reliable as to this point.

---

[5]  Sullivan was critical of the records during his testimony, but the defense relied upon the records when it was to their advantage.

- "<u>Nancy Sullivan Loans</u>."  Sullivan made two $5,000 unsecured loans to Nancy Sullivan for operating funds for her business Carvin' Copies.  The first loan was made in 1997 and the second in 1998.  The credible evidence is that these loans were repaid with 10% interest.  In fact, the Quickbooks records suggest the loan was overpaid,  but this appears to be simply a  problem with the Quickbooks data.

- "<u>Ruth Garica Trust Loans</u>." Sullivan also transferred Trust funds to another trust he was administering, the Ruth Garcia Trust.  The Quickbooks records suggest that $900 may yet be owed by the Ruth Garcia Trust, but the records are not sufficiently reliable enough to reach this conclusion.

22.    Sullivan at no time informed Anderson that he was making these loans, but, as previously noted, Anderson acquiesced to Sullivan's broad financial management of the Trust's financial affairs without the necessity of prior consultation or approval. Also, the Trust document permits the making of loans as an authorized investment.  Nevertheless, the fact the loans were made to family and friends makes the transactions suspect, and most authorities would treat transactions with one's spouse as *per se* self-dealing.[6]

Moreover,  unsecured loans to family and friends seem a particularly risky investment for a person with limited funds and who, during the time frame these loans were made, was dependent upon the money for day-to-day living expenses.  Further, Sullivan did not give a credible explanation for why these loans were  better than more conventional, albeit more conservative, investments such as CD's, money market accounts, or mutual fund investments.  Fortunately, it does not appear that Anderson lost any significant amounts with respect to these transactions.

---

[6]  <u>See</u> <u>generally</u> 76 Am. Jur. 2d <u>Trusts</u> § 353 (2007).

23.     In her post-trial brief, Anderson has elected to forgo calculating any affirmative damages with respect to these loan transactions, given the relatively small amounts that may be involved in terms of nonpayment, but she asks the court to consider the transactions in connection with her claim for punitive damages and Sullivan's request for compensation for his Trust work.

**Sullivan's conversions of Trust assets for his own purposes**

24.     In addition to making loans to family and friends, Sullivan commingled the Trust's funds with his own, but determining the extent of the commingling has been rendered difficult because the evidence of the co-mingling is spread out over a number of individual transactions and records and because Sullivan never contemporaneously kept a separate track of the commingling - at least none that was uncovered by plaintiff's counsel.  The reconstructed Quickbooks records address most of the commingling, but, for the reasons already explained, this data may not be complete or necessarily accurate.

25.     In addition to commingling the Trust's funds with his own, Sullivan converted Trust's funds for his own use or purposes on multiple occasions, including the following:

- "$6,647.90 Transfer to the Edward Jones Account."  The Quickbooks accounting shows two checks written from the Trust account to Sullivan's  Edward Jones account:  one check dated 9/29/1994 in the amount of $5,066.95 and the other check dated July 10, 1995, in the amount of  $1,580.95.  The records show a partial repayment of these amounts on November 27, 1995, in the amount of $4,397.05, leaving a balance owed of $2,250.85.  Sullivan introduced a check dated December 28, 1995, in the amount of $2,850.85, which has a notation on it "partial loan repay + $600 int."  Based on credible evidence, it appears this check was to repay the

principal balance of $2,250.85 left owing on the amounts transferred to the Edward Jones account with an additional amount for interest, since $2,250.85 plus $600 for interest totals $2,850.85.  Anderson did not suffer any material financial loss from this transaction.  On the other hand, there is not sufficient evidence before the court to determine what her personal needs were for money at that time.

- "$5,306.59 Transfer for GPS Client." The Quickbooks records show a receivable being owed the Trust under the category "GPS Client" in the amount of $5,306.69 based on a check written from the Trust's account for that amount on April 7, 1995. The records shows that the amount owed was later reclassified from the category "GPS Client" to the receivable category "dia.net," suggesting that Sullivan at some point considered it his obligation.  At trial, Sullivan acknowledged use of the funds. He vaguely suggested  it may have been a loan to a client whom he did not identify, but stated he was responsible for repayment.

Sullivan argues that  the $5,306.69 must be reduced by the $2,250.85 payment he made as evidenced by the check in Ex. 119.  The credible evidence, however, is that this $2,250.85 is the same payment that was used to repay the outstanding balance with respect to the Edward Jones Account so it would be double counting to credit it also to the balance of the "GPS Client" item, which was ultimately reclassified to the category "dia.net." Essentially, this was the conclusion of Anderson's accounting expert and is supported by an examination of Ex. 203,

from which the information in Ex. 119 is a mere snapshot.[7]  Consequently, the credible evidence is that the entire $5,306.59 involved in this transaction is still owed, except to the extent it may be offset by general reimbursements to the Trust that Sullivan later made in 2002 as discussed later herein.

- "$4,500 Transfer to DIA."  On November 13, 1997, $4,500 of Trust money was deposited into DIA's bank account for DIA's use.  Sullivan acknowledged that this money was never repaid.

- "$9,480.93- Misapplied Royalty Checks."  In 1999, three royalty checks payable to the Trust were misdirected into one of Sullivan's accounts as follows:  Amerada Hess $1,196.14 deposited June 25, 1999; Sheridan California Energy $5,730.13 deposited December 31, 1999; and Vintage Petroleum $2,554.66 deposited December 31, 1999.  Together these checks total the sum of $9,480.93.  Later, these amounts show up as loan receivables owed the Trust under the category "dia.net" in the Quickbooks accounting for the Trust along with a notation that there was a deposit error. Sullivan does not contest the fact that he owes this money, but argues the mis-applied funds were never a DIA obligation and further that the mis-deposits were not intentional and mere mistakes.  The credible evidence, however, is that the use of the funds was not the result of mere mistake given the amounts involved, the

---

[7]  In exhibit 203, the $2,250.85 is posted to the receivable "GPS Client," but this entry is reversed and the amount is reclassified to "dia.net" along with the principal amount of $5,306.59.  The $2,250.85 is then subtracted from the cumulative amounts shown as being owed by "dia.net," including the  $5,306.59.  The problem with this is that the $2,250.85 was obviously intended to pay off the balance owed on  the Edwards Jones transactions, the principal balance of which was not similarly reclassified to "dia.net" and which shows on exhibit 203 to still be a receivable owed the Trust.  In other words, the credit of $2,250.85 to "GPS Client" was wrong and so was its reclassification to "dia.net."

lack of any evidence that Sullivan was receiving similar types of royalty payments for his own account, the other conversions of funds, and, perhaps most tellingly, the fact the funds were not immediately restored when the "mistake" was discovered. Instead, the amounts were simply listed in the Quickbooks records as "receivables" owed the Trust.

- "$100,000 Transfer to DIA." On January 26, 2001, Sullivan transferred $100,000 from the Trust's account to DIA's bank account by a check that Sullivan had deposited the same day it was written.[8] The payee on the check is identified as "dia.net" and there is a notation on the check in the remarks section "loan/purchase." The same day that Sullivan deposited the $100,000 into DIA, he wrote and had deposited a check from his DIA account to his personal account at Gate City in the amount of $35,000. As of January 26, 2001, when these transfers were made, Sullivan's DIA account was overdrawn and DIA needed funds to pay bills, including an upcoming $5,000 sales tax payment. Also, and perhaps even more significantly, Sullivan's personal account was within a few hundred dollars of being overdrawn and there was outstanding a $29,000 check that Nancy Sullivan had written two days prior toward the purchase of a condominium in Florida.[9]

- "$56,716.40 Condo Purchase Transfer." On March 14, 2001, Sullivan wire transferred $56,716.40 in Trust funds to a realtor in Florida through whom the

---

[8]  The check is dated 2000, but everyone agrees that this was an error and that the check was written in 2001.

[9]  Ex. P-13 indicates that there were insufficient funds in Sullivan's personal account to cover the $29,000 check. Further, no additional deposits were made after the deposit of the $35,000 and before the $29,000 check cleared. Consequently, $29,000 of the $35,000 deposit can be traced directly to the condominium.

Sullivans were purchasing a $300,000 condominium, and for which they had already arranged a $220,000 mortgage loan. When the $56,716.40 is added to the $29,000 that had already gone to the condominium purchase, the total amount of Trust funds that are directly traceable to the condominium is $85,716.40.

26.    In contrast to the transactions with family and friends, there is no evidence of any documents being created in advance establishing basic loan terms such as the time for repayment or the rate of interest to be charged. And, except for the transaction involving the transfer to the Edward Jones Account, there is no evidence of any repayment that included a calculation of interest. In the Quickbooks records that Sullivan started to develop for the Trust in 1999, the foregoing items are treated as receivables, but this was after a number of the conversions had already taken place.

**Lack of timely disclosure by Sullivan of his self-dealing**

27.    The only disclosure that Sullivan made to Anderson of his personal use of the Trust funds came in the Spring of 2003 - some two years after the last documented conversion and then only after he had made some attempt at repayment. At a meeting in Williston in 2003, Sullivan advised Anderson that he had made the $100,000 Transfer to DIA and the $56,716.40 Condo Purchase Transfer for "protective purposes," which Anderson understood to be avoiding an IRS levy on the Trust's funds. At no time did Sullivan disclose his other uses of the Trust property.

**Sullivan's "protective purpose" justification  lacks credibility**

28.    At trial, Sullivan continued to insist that he made the $100,000 Transfer to DIA and the $56,716.40 Condo Purchase Transfer for "protective purposes" and that he at all times was acting in Anderson's best interests. Sullivan's "protective purpose" explanation lacks credibility for a number of reasons.

<u>First</u>, there is the problem of the timing - particularly with respect to the $100,000 transfer. It strains credulity to believe that Sullivan just happened to go through an analysis of what he needed to do to protect the Trust's funds from levy by the IRS at the very time he was in immediate need of liquid funds.  As already noted, Sullivan's DIA account was overdrawn on the date of the $100,000 transfer.  And, his personal account was within a couple of days of being overdrawn because it did not have sufficient funds to cover the $29,000 check written two days prior for the Florida condominium - a situation that Sullivan remedied by immediately transferring $35,000 of the $100,000 deposited in the DIA account to his personal account.

At trial, Sullivan's explanation for the timing was that it was essentially fortuitous.  He testified it was not his immediate need for funds, but rather the appearance of an unexpectedly large royalty check in the amount of $50,088.86 that caused him to "panic" and transfer the $100,000. He claims that, but for the need to "protect" the $100,000 from an IRS levy, he would have  taken care of the problems in his business and personal accounts using available lines of credit or other resources.

A significant problem with this testimony, however, is the unlikelihood that Sullivan had actually received the $50,088.86 check prior to making the $100,000 transfer.  The $50,088.86 royalty check was issued on January 24, 2001, by Calpine Natural Gas Company of Houston, Texas.[10]  And, it was not deposited in the Trust's account until January 29, 2001,[11] which was three

---

[10]  Exhibit D-115 has attached to it copies of several of the Calpine checks and check stubs that were issued during this time frame.  Page 3 of the exhibit at the top has the check stub corresponding to the $50,088.66 check and the date on the stub indicating the date of the issuance of the check is January 24, 2001.  Unlike the other pages of the exhibit that have both the checks and check stubs, the copy of the $50,088.66 check is not reproduced.  For the other checks, the dates shown on the stubs match and the dates of the checks.

[11]  See Ex. P-10 and D-115 (first page).

days _after_ the $100,000 check was written and deposited into DIA's account on January 26, 2001.[12]

Even if the royalty check had been mailed the same day it was written, it seems improbable it would have been received in Williston on or before January 26, 2001, given the mailing distances and Williston's remote location.

Morever, the circumstantial evidence supports the conclusion that the $50,088.86 royalty check was not received until after the $100,000 had been transferred. As previously noted, not only was the $100,000 check written and deposited on January 26, 2001, so also was the $35,000 check that was deposited to cover the outstanding $29,000 check going toward the condominium purchase.[13] If the $50,088.86 royalty check had arrived on or before January 26, it seems peculiar that it would not also have been deposited on January 26 along with the $100,000 check and the $35,000 check, particularly since Sullivan's personal account, into which the $35,000 was deposited, and the Trust's account were both at the Gate City Bank.[14] Instead, the bank records show the $50,088.86 was deposited on January 29, 2001.

But, even if the $50,088.86 check had arrived on January 26, 2001, Sullivan's claim that the $100,000 transfer was made to "protect" the Trust's funds, and not to satisfy his immediate needs

---

[12] See Ex. P-9 (copy of the $100,000 check to "dia.net" dated January 26, 2000), Ex. P-5 (copy of DIA's January 2001 bank statement showing the deposit of $100,000 on January 26, 2001), and Ex. P-11 (deposit slip showing the deposit of the $100,000 on January 26, 2001).

[13] See Ex. P-12 (front and back).

[14] Sullivan's post-trial brief repeats the claim that it was the receipt of the $50,088.86 royalty check that caused Sullivan to panic and make the $100,000 transfer from the Trust's account. Sullivan's brief makes no attempt to argue that the royalty check was received on January 26, 2001. Rather, to make the facts fit, Sullivan's brief claims the transfer of the $100,000 did not take place until January 31, 2001, and after the deposit of the $50,088.86 on January 29, 2001. The January 31, 2001, date that the brief relies upon, however, is the date the $100,000 check cleared the Trust's account at Gate City (see Ex. D-116) - not the date it was written and deposited in DIA's account, which occurred five days earlier and three days before the deposit of the royalty check as indicated above.

for cash, suffers from an even more fundamental timing problem, and that is the fact the Trust account had already built up a substantial balance that Sullivan made no attempt to "protect" from an IRS levy prior to his immediate personal need for funds on January 26, 2001.

More particularly, earlier in January 2001, and before Sullivan's business and personal accounts were overdrawn or soon to be overdrawn, the Trust's account had increased to $125,000. There is no evidence Sullivan was concerned about an IRS levy at that point. Further, the Trust account's balance had been increasing for some time. In fact, Sullivan testified that he first contemplated purchasing the local Culligan franchise for the Trust in 1999 and that he had rejected one offer by its owner to sell in 1999 and another in 2000 - not because the Trust did not have excess money, but because he believed the price was too high. And, there is no evidence of any concern on Sullivan's part during this two-year period of needing to make transfers for "protective purposes."

Second, apart from the timing problems, Sullivan never explains how his taking of the Trust monies was "protecting" Anderson from the IRS's ability to reach the assets. As an attorney, Sullivan was surely aware that the IRS can levy upon any form of asset.[15] And, if the argument was that he was hiding the money, Sullivan now claims that his "protective" transfers were so transparently performed that anyone would realize the monies he took were "receivables" owed to and owned by the Trust. Further, within a short period of time, Sullivan took $95,000 of the money that he was "protecting" from the IRS and purchased the local Culligan franchise, which according to his testimony became a Trust asset from day one. Also, within a few months, he took another

---

[15] Arguably, it may be easier for the IRS to seize cash - at least from Anderson's personal back account - than to go through the additional steps that may be required to realize upon other assets. If there had been any history of the IRS actually seizing cash from the Trust's account in the last nine years and if the timing had not been so suspect in terms of Sullivan's short term need for liquid funds, the court might have been more receptive to this explanation.

approximately $72,000 that had built up in the Trust and purchased an older building in Williston in the Trust's name.  Finally, the IRS would have become aware of the large royalty payments that the Trust received in 2001, which totaled almost $340,000, in any event since the income needed to be reported either by the Trust or as a roll-over to Anderson's personal income tax returns.

Third, another problem with Sullivan's "protective purpose" justification (but which is consistent with his not having made any prior "protective transfers") is the fact there had not been any recent collection efforts by the IRS as to the Andersons personally, much less the Trust itself. In fact, following the Trust's dismissal from bankruptcy, the IRS had never once attempted to levy upon the Trust's assets.  In other words, in the nine years prior to Sullivan deciding on January 26, 2001, that he needed to make an immediate "protective purpose" transfer, the IRS had not once attempted to seize money from the Trust's account.

More particularly, the large tax assessments that were the primary focus of Sullivan's professed concern dated back to the late 1970's or early 1980's, before Anderson first met Sullivan in 1985.  And, there is no evidence of the IRS having made any collection effort with respect to the large pre-1985 assessments following the execution of the agreement with the IRS in late 1991 - some nine years earlier when Anderson was dismissed from the bankruptcy.  Rather, as of the time of the transfer of the $100,000 on January 26, 2001, the only evidence of any collection efforts on the part of the IRS since the dismissal from bankruptcy in 1991 had to do with tax problems relating to the 1987 and 1995 tax years.  And, these were:  (1) a 1998 final notice of intent to make a levy for $57,851.45 for the tax year 1987, while Anderson was in bankruptcy and which was only for interest and penalties; (2) two notices issued in 1998 that the IRS had offset overpayments made by Anderson in two prior tax years to reduce the interest and penalties owed for the tax year 1987, and

21

(3) a notice of past due taxes for the tax year 1995 that amounted to only several hundred dollars.

In fact, by 2001, all of the evidence points to the fact that the IRS had abandoned it collection efforts

with regard to the pre-1985 assessments years earlier.  And, if so,  Anderson could have at that point

resolved her remaining tax problems relating to the 1987 and 1995 tax years for an amount less than

$75,000, even with no compromise by the IRS, which is less than one-half of Sullivan's 2001

"protective purpose" transfers.[16]

---

[16] Sullivan introduced Ex. D-111 to suggest that Anderson still owed huge tax liabilities as of 2001, but, if anything, that exhibit suggests the contrary.  Ex. D-111 is actually  a compilation of several different documents that have been cobbled together.  In particular, it contains several notices directed to the Andersons from the IRS relating to the 1987 and 1995 tax years, which have already been discussed above.  Also, it includes a schedule of liens that appears to have been a part of a title insurance policy issued in connection with a quiet title action, which was initiated by the Trust on a portion of the Fort Bragg property so that it could be purchased by Sullivan's nephew, Shawn Sullivan. Sullivan testified he received this Exhibit in March 2001, which, notably, is after the $100,000 transfer to DIA.

More particularly, the schedule of liens in Ex. D-111 shows a federal tax lien recorded on December 26, 1997, in the amount of $1,932.59.  It also shows three other tax liens that were all filed on March 29, 1991, in the amounts of $201,110.26, $91,139.92, and $58,906.82, for a total of approximately $351,000.  While the tax years are not identified, other evidence indicates the two larger liens  were for  delinquencies for tax years before 1985, and  the $58,906.82 lien most likely was for the  interest and penalties assessed for  the 1987 tax year while Anderson was in bankruptcy.

The credible evidence is that the IRS had abandoned any effort to collect on the  larger pre-1985 tax delinquencies well before 2001.  The most obvious indication is the fact that not once during the nine years following 1991did the IRS make any effort to collect on the pre-1985 tax delinquencies.  After 1991, the only efforts made were to collect for the delinquencies for the 1987 and 1995 tax years, which, as discussed in the text above, involved much smaller amounts of money.  In fact, twice in the 1990's the IRS made administrative offsets against overpayments of taxes by the Andersons and both times the offsets were against the delinquency for the 1987 tax year and not against delinquencies for any earlier years.  Moreover, of the three  tax liens filed on March 29, 1991, Ex. D-111 shows that the only one the IRS bothered to re-file on February 18, 2000, was the lien in the amount of $58,906.82, which most probably relates to the 1987 tax year.  And, while the IRS's lien for delinquent taxes arises immediately upon assessment as to the taxpayer, and the filing of tax lien notices is done merely to give the IRS priority as to third parties, the fact the IRS did not bother to re-file the two larger tax liens suggests abandonment of the delinquencies associated with the liens - most probably because of a belief that the statute of limitations had run on the pre-1985 delinquencies, even assuming the tolling of the period of limitations during Anderson's bankruptcy and the lengthening of the period of limitations from six years to ten years in 1990.

Thus, contrary to the impression Sullivan attempted to create by his trial testimony, the IRS was not beating on  Anderson's door attempting to collect hundreds of thousands in past due taxes when, in January 2001, he transferred $100,000 of Trust money to DIA and then several months later another  to complete the condominium purchase.  As indicated in the text above, the only collection efforts that had been made by the IRS since 1991 had to do with tax liabilities that most probably could have been satisfied for an amount less than half of what Sullivan transferred.

Moreover, the events subsequent to 2001 simply reinforce this point.  In 2002, the IRS renewed its collection efforts with respect to the 1987 tax year.  And, this time Sullivan referred the Andersons to tax counsel who immediately challenged the collection effort resulting in a tax court ruling in 2002 that temporarily halted the effort to levy against Anderson because of procedural irregularities and that absolved Lloyd Anderson of any responsibility for the 1987 tax year.  Again, in all of this activity, there is no mention of any tax liabilities for earlier years and no apparent concern in awakening the "sleeping bear" by taking the IRS to tax court.

Still later, in 2006, a portion of the Fort Bragg property was sold for 1.2 million, and the only  tax lien that had

When asked on cross-examination about the lack of any recent IRS collection efforts, particularly with respect to the older tax liabilities, and why he did not use the large buildup in the Trust's funds to try and resolve Anderson's IRS problems, which was one of his stated goals for administration of the Trust, Sullivan's only explanation was that the time was not right to deal with the IRS.  But this explanation also lacked credibility, not only because of the timing and Sullivan's need for liquid funds, but also because there is no evidence of Sullivan ever having made an effort in the years leading up to 2001 to investigate the current status of the IRS's claims, much less explore the  possibility of a compromise.

Fourth, by 2001, Sullivan had already converted other, smaller amounts of Trust funds for his own use  and upon cross-examination admitted the obvious, which was that these transfers were not for "protective purposes."  The fact that Sullivan had already been converting funds for his own use supports the notion that the two larger transfers in 2001 were merely a continuation of what he had already been doing.

Fifth, Sullivan is an attorney.  One would think the last place an attorney would want to place money for "protective purposes," if he truly believed IRS action was imminent, would be in his own business and his future home.

_____

to be cleared to facilitate the sale according to the replacement trustee was a lien for unpaid Culligan payroll taxes for the year 2003.  Sullivan suggests this is evidence that the large income tax liens, which  showed up in the schedule of liens prepared in 2001, had disappeared inferring, that the tax liabilities had gone away between 2001 and 2006.  But, the evidence does not suggest this at all.  First, there is no evidence that the liens had "disappeared."  The replacement trustee had no knowledge of the lien records.   More likely, the liens were still there and a title examiner concluded they were no longer enforceable and could be ignored.  Second, the liens are not the actual liabilities and simply because old liens showed up of record in 2001 does not mean the liabilities were enforceable at that time. As already indicated, the large liens that were of most concern related to pre-1985 tax liabilities  The liens for these tax liabilities were never renewed, and there had been no collection efforts after 1991.  The  more pertinent questions are when did the statute of limitations run on the pre-1985 tax liabilities, and more practically, when did the IRS abandon its efforts to collect on these older liabilities?  The evidence indicates that this likely was well before 2001.

29.     For all of the above reasons, the court finds that Sullivan's primary motivation in making the conversions of Trust funds, including the $100,000 transfer to DIA and the Condo Purchase Transfer, was simply his desire to use the money and its ready availability.[17]   The claim that the two largest transfers were for "protective purposes" is an after-the-fact rationalization, at best, and Sullivan's continued insistence that this is what motivated him gave the court pause in assessing the credibility of his other testimony.[18]

**Sullivan's intent to eventually make good on the converted funds**

30.     Although Sullivan knowingly and intentionally converted Trust funds for his own use, the credible evidence is that he did so intending that he would eventually make good on his use of the money - at least with respect to the principal amounts converted.  As discussed in more detail below, Sullivan made several repayments, the last of which was on August 26, 2002, in the amount of $30,000.   And, with that payment, he was close to being even on a gross basis without consideration of interest or profits derived from the converted assets.  In fact, by that point, Sullivan may have believed he was more than even, so to speak, given that he had not yet charged the Trust for any of his time in administering the Trust's financial affairs.

---

[17]  Sullivan claimed he had other financial resources and did not need  the Trust's money when the transfers were made.  In particular, he pointed to a line of credit that he had at the bank and to a brokerage account.  But, Sullivan would have had to pay interest on the line of credit.  And, while the line of credit may have been sufficient to satisfy the current overdrafts, it is not clear it would have been sufficient to cover what appears to have been Sullivan's desire for use of much larger amounts of money for operating his business and for personal purposes in terms of the condominium purchase.  Further, what little evidence was presented with regard to his brokerage account suggests he would have had to liquidate  investments in that account in order to come up with the cash and that he decided for his own purposes not to do this.   This is based on the nature of the account and his testimony that the account had gone down in value with the drop of the market in 2000 from a little over $100,000 to approximately $78,000, which is consistent with the funds being invested and not in cash.

[18]  The court also found parts of the Andersons' testimony to be lacking in credibility.   In particular, Anderson made several misstatements in affidavits filed with the court and during her trial testimony.  While some of these appear to have been the result of either innocent mis-recollection or confusion, this was not true in all instances.

Also, bearing on the issue of his intent is the fact that, while there were times that Sullivan was less than forthcoming to Anderson, he did not attempt to hide his use of the money by creating a number of false records, for example.  In fact, the electronic Quickbooks records that were developed for the Trust, such as they are, make reference to most, if not all, of his uses of the money and categorized the uses as receivables that had been owed, or that were still owing to the Trust, depending upon the date of the record.  Further, he eventually told Anderson about the larger conversions, albeit not until some two years later and then only after he had attempted to restore most of the funds.

Finally, Sullivan appears to have used his own money on one or more occasions to make good on loans that he had made to family or friends and that were not repaid.  There is some evidence of this in connection with the one of the loans made by the Trust.  Also, when Sullivan later sold DIA in 2001, he used part of the sales proceeds to reimburse the Ruth Garcia Trust on a loan that he made to an acquaintance that had not been repaid.

But, regardless of what may have been Sullivan's intent in terms of making good on the funds that he converted, the fact remains that he placed  the Trust and Anderson at significant risk when he converted the money, particularly given the magnitude of the conversions.  As it turned out, Sullivan was able to later sell DIA for a substantial profit and from this was able to restore the bulk of what he had converted on a gross basis, but there never was any guarantee this would occur.[19]

---

[19]  Sullivan did not decide to sell DIA until later in 2001.  While Sullivan may have believed that DIA was worth a substantial amount of money in 2001when he transferred the Trust's funds to DIA's bank account, there is no telling what might have happened if the opportunity to sell DIA's assets had not arisen in 2001, or if Sullivan had decided not sell at that point.  For example, DIA's value could have substantially deteriorated if a large internet service provider, such as cable TV company or a phone company, entered the market and offered more services, including broadband access.

Further, Sullivan was not a young man and had obvious health problems.  If he had passed away for some reason prior to making the reimbursements, there is no telling whether Anderson would have been able to recover the funds that had been converted.

**Sullivan completes the purchase of the Florida condo assisted by Trust money**

31.    The Sullivans closed on their purchase of the Florida condominium on March 16, 2001.  The total amount of Trust funds that Anderson can trace as going directly to the condominium purchase is $85,716.40.  This is comprised of the $29,000 check written by Nancy Sullivan on the Sullivan's personal account, which at the time did not have sufficient funds and which was covered two days later on January 26, 2001, by the $35,000 deposit of Trust funds via a momentary paper stop in DIA's account.  The remaining $56,716.40 came from a wire transfer of Trust funds to a realty company handling the purchase transaction on March 14, 2001.

The purchase price for the condominium was $300,000, and the Sullivans financed $222,000 of the purchase by executing a note secured by a mortgage. When the amount of the Trust funds going toward the purchase and the amount that the Sullivans financed are added together, the total is $5,714.40 more than the purchase price.  The record does not disclose where the additional money went, but it is possible that it was used to pay costs in connection with the closing or possibly a proration of taxes.

32.    The real estate description for the Florida condominium is the following:

Unit 433 of Island Dunes Condominium A, a condominium according to the Declaration of Condominium in O. R. Book 400, Page 2021, and all exhibits and amendments thereof in the public records of St. Lucie County, Florida; together with all appurtenances thereto, including an undivided interest in the common elements of the said Condominium as set forth in the Declaration thereof, together with the exclusive use of Parking Space No. 433 and Liquor Bin No. 433, all of said property located in the County of St. Lucie, State of Florida.

26

**Trust's purchase of the B&B Building**

33.     In August 2001, Sullivan purchased the "B&B Building" in Williston on behalf of the Trust for $72,500.  This purchase was made with the Trust's funds even though Sullivan was holding well over $150,000 of the Trust's money at that point. Several months later in November 2001, however,  Sullivan purchased Culligan for the Trust, but this time used what he claims were his own funds to repay what he had earlier taken.  The only difference between August 2001 and November 2001 was that the large sums of money that Sullivan converted from the Trust were still tied up in DIA and Sullivan's condominium in August 2001, but by November 2001 he had sold DIA.  In other words, the timing of the "repayment" had nothing to do with the Trust's needs for funds and everything to do with Sullivan's personal uses of the money.  This is yet another indication that the 2001 transfers were not for "protective purposes."

Sullivan claimed that a later appraisal of the B&B Building, which was made in connection with an attempt to obtain financing for a Culligan bottling plant in 2003, showed it as being worth $147,000, but this testimony was of questionable reliability.[20]  On the other hand, Anderson is not complaining about the B&B Building, which suggests she has not suffered any substantial loss with respect to that transaction.

**Sullivan sells DIA for a substantial gain**

34.     In August 2001, Sullivan was approached by Northwest Communications Cooperative ("NCC") about purchasing DIA.  There is no evidence that Sullivan was actively

_____

[20]  The actual appraisal was not presented so there was no way to verify the accuracy of Sullivan's recollection, much less make any judgment about the quality or reliability of the so-called appraisal.  Further, when the local bank was considering the possible loan to Culligan in 2003, the loan officer in her comment sheets (Ex. D-153) listed the value of the property at $72,000.  Nevertheless, even if the property had appreciated in value, it would not change the court's damage award.

involved in attempting to sell DIA prior to that point.  Negotiations with NCC resulted in a sale effective the last day of September 2001 for a base price of $760,000 plus one-half of the value of the inventory of Micronet, subject to some adjustments  The sales agreement also provided for an escrow of 5% of the base price, which was to be held for three months to insure that certain conditions of the sale were met by Sullivan.

35.    The credible evidence is that NCC paid the following amounts pursuant to the sales agreement:

- NCC paid Sullivan the base price less the 5% on October 1, 2001, in three separate payments totaling $722,000 as follows:  $122,000 to Sullivan's personal account at Gate City; $100,000 to DIA's existing account at American State Bank, and $500,000 to a new personal money market account set up by Sullivan at American State Bank.[21]

- Another $45,855.10 was transferred by wire to Sullivan's new American State Bank account, which was deposited on November 19, 2001.[22]  The credible evidence is that this was for the payment on the Micronet inventory and possibly other adjustments as provided for by the sales agreement.

- The check for the escrow payment of $38,000 was written by NCC and deposited in escrow with the First National Bank on or about October 1,

---

[21]  Ex. P-16 sets forth copies of the debit slips evidencing the  three wire transfers.  In each case, the amount charged NCC's account was fifteen dollars to reflect the wire transfer charge.

[22]  Ex. P-18 is a copy of the debit slip for the wire transfer from NCC to American State Bank in the amount of $45,870.10 dated November 16, 2001. Ex. 21 is a copy of the bank statement for DIA's American State Bank account showing the deposit of $48,855.10.  As with the other wire transfers, the difference in the amount is the wire transfer charge of $15.

2001.  Pursuant to the sales agreement, this amount was to be held in escrow for three months.  The evidence shows that it was released from escrow and paid to Sullivan on  January 11, 2002.[23]

Consequently, rounding off and not including interest earned on the escrow, the total amount paid by NCC was $805,000.[24]

36.     Anderson claims that she is entitled to a share of the gain from the sale of DIA because of the Trust money that was commingled in DIA as of the time of the sale.  For reasons discussed in more detail in the conclusions of law, the court finds that Sullivan intentionally placed $4,500 of the Trust money into DIA in November 1997 and another $65,000 in January 2001, that these funds were used in DIA's business operations, and that these amounts remained unpaid as of the time of the sale of DIA.  The court further finds that Sullivan's basis in DIA was no more than $300,000 at the time of the sale based on his trial testimony.

**Acquisition of Culligan on behalf of the Trust**

37.     On November 15, 2001, Sullivan wire transferred $95,000 from the money market account established at American State Bank to receive the bulk of the sale proceeds from DIA to the owner of the local Culligan franchise in Williston for the purchase of the local dealership's

---

[23] Ex. P-23 contains the January 2002 bank statement for Sullivan's new American State Bank money market account showing the deposit of $38,109.79, along with an attached deposit ticket showing this amount as having been wire transferred from First National Bank on behalf of NCC.  Presumably, the additional $109.79 was for interest earned while the money was in escrow.

[24] The amount shown on Sullivan's 2001 tax return as the amount of the sale was only $722,000.  Obviously, this did not include the escrow that was paid in 2002.  It is not clear, however, why the remainder was not reported.  Sullivan did not introduce his 2002 tax return so it cannot be determined whether that amount was reported in the following year.

assets.  The next day Sullivan set up a separate account for Culligan at the American State Bank and transferred $15,000 from his account to the Culligan account, presumably for operating funds.

**December  2001 Florida visit and disclosure of Culligan and B&B Building purchases**

38.      In late December 2001, Anderson traveled to Florida for a ten-day stay with the Sullivans.  The Sullivans, having completed the purchase of their condominium in March and having sold DIA in October, had permanently moved to Florida in late 2001.

Much of the time during Anderson's Florida visit was spent on social and recreational activities.  However, there was some discussion about the Trust and it was during this visit that Sullivan first told Anderson he had purchased the local Culligan franchise and the B&B Building on behalf of the Trust, without being specific as to where the money had come from.  The credible evidence also is that he "neglected" to mention the $100,000 transfer of Trust funds to DIA, part of which was immediately used toward a down payment on his Florida condominium, and the $56,716.40 wire transfer to complete the condominium purchase - much less the fact that he had not yet restored all of the funds.   Sullivan acknowledges he may have not told Anderson about the specifics of these transactions during this Florida visit, but claims he advised her generally that he had made other "protective transfers" on the Trust's behalf, both at the time the transfers were made and again during this Florida meeting.  The court finds these statements likely did not take place, because he had not yet made reimbursement to the Trust and also because of Anderson's testimony that no such disclosure was made at that time.

Also, during this Florida visit, Sullivan encouraged Anderson to think about moving to Williston with her family to operate the Culligan franchise.

**Andersons move to North Dakota to run Culligan**

39.     In June 2002, the Andersons and their daughter traveled to Williston to look over the Culligan business and to make a decision about whether they wanted to move to Williston to operate the business, as was being suggested by Sullivan.  At the same time, they also inspected the B&B Building that Sullivan had purchased for the Trust.  During this visit, no complaints were made to Sullivan about the purchases of Culligan and the B&B Building for the Trust.

The Andersons stayed in Williston about a month and eventually made the decision that they were going to move.  They went back to Oregon and returned to Williston in August 2002 to establish permanent residence and operate Culligan.

**Controversy over the purchase of Sullivan's residence in Williston**

40.     While the Andersons were visiting Williston in June, they looked at a number of homes, including Sullivan's, whose house was vacant and on the market since he had by then moved to Florida.  They found a house that they liked that cost $135,000, but Sullivan indicated they only had about $100,000 to work with - $30,000 of Trust money and $70,000 in the form of a loan from the Ruth Garcia Trust.  Finding nothing else they liked in that price range, they decided upon Sullivan's house.

When it came time to complete the purchase, Sullivan structured the transaction so that the loan from the Ruth Garcia Trust, which was secured by a mortgage, required a balloon payment after five years.  Sullivan testified this was the only way he could get them into a house because the Andersons' credit was so poor and yet be fair to the Ruth Garcia Trust.

Anderson now claims that she was taken advantage of by the way the transaction was structured in terms of the balloon payment and by Sullivan's pushing her into purchasing his

residence.  However, Anderson and her husband had the opportunity to review the loan documents and ask questions of another attorney that Sullivan retained to handle the closing before they signed the papers.  Further, it does not appear that Anderson has lost any money on this transaction.

Nevertheless, what is less than clear is whether Sullivan was entirely up front with Anderson about what monies were actually available to her from the Trust, particularly since he had not yet restored all of the money that he had converted dating back to the mid-1990's, and this is without considering the fact that Anderson was entitled to part of the gain from the sale of DIA at that point.

**The controversy over Culligan**

41.    When Anderson and her family moved to Williston in August 2002, she and her husband  became involved in the running of Culligan and eventually took over responsibility for its day-to-day operations, although Sullivan continued to have a say in the decision-making given that the business was a Trust asset.  Also, Sullivan continued to handle the bookkeeping from Florida as part of the bookkeeping that was being done for the Trust.  This situation continued up to the time that Sullivan was terminated as co-trustee in the spring of 2004.  There is no evidence during this time period of Anderson ever complaining to Sullivan that he lacked the authority to purchase Culligan or that he should not have purchased it.

Also, during this time, the Trust made substantial additional cash infusions into the business. It appears that much of this was the result of the Andersons' poor management and excessive spending, but it also appears that Sullivan probably overestimated the earning potential for the business.

42.     Anderson now takes the position that Sullivan purchased Culligan for his own purposes and it was only when he discovered the business was a "dog" that he unloaded it on the Trust.  In particular, Anderson points to the following:

•       The fact that money for the purchase and for immediate operating funds came from Sullivan's personal account into which he had deposited the sales proceeds from the sale of DIA.

•       Shortly after the purchase of Culligan, Sullivan completed a form entitled "Sole Proprietorship Resolution of Authority" certifying that he was the sole owner of Culligan and that his federal tax ID number was his personal social security number. In the resolution, he listed himself, Nancy Sullivan, and Patti Bingeman as persons authorized to write checks and withdraw funds from the account.  At about the same time, Sullivan also executed a Merchant Bankcard Application with American State Bank for handling credit card transactions.   In the application, Culligan was identified as a sole proprietorship owned by Gary Sullivan.

•       Immediately following the purchase of Culligan, the bank statements for the Culligan account were in Culligan's name, using Sullivan's personal address. Starting with the April 2002 statement, the name on the account was changed to Gary Sullivan with the statements being sent to his Florida address.  Then, after several more months, the statements were in the name of Gary Sullivan, but with Sullivan's Williston address.  It was not until early March 2004 that the name on the bank statements for Culligan was changed to the name of the Trust.

On the other hand, there is other evidence indicating that Sullivan purchased Culligan for the Trust, including an affidavit procured by Anderson's attorney from the seller indicating that Sullivan had advised him that the purchase was on behalf of the Trust.  Further, within less than two months after the purchase of Culligan, Sullivan informed Anderson that he had purchased it for the Trust and Anderson acknowledges this conversation took place.  And, while the business did turn out to be a  poor investment,  it is doubtful that Sullivan could have come to the conclusion within the short period of time between its purchase and his conversation with Anderson that it was indeed a bust.

The court finds that Sullivan intended from the beginning to purchase Culligan for the Trust and that he did so from the funds generated from the sale of DIA in an attempt to partially restore what he had earlier converted. Further, the court finds credible Sullivan's explanations for the inconsistent evidence relied upon by Anderson.

43.      Nevertheless, why Culligan was purchased in the first place remains a mystery.  At one point, Sullivan suggested that part of the reason he bought the business was because he thought it would be a good opportunity for Anderson and her husband to develop and that Williston would be a safer environment for the raising of their daughter during her teen years.  However, one would think that, if this was Sullivan's motivation, he would have had a series of discussions with Anderson first to make sure this was something she wanted, particularly since it involved moving to North Dakota. Further, what is even more difficult to understand is how Sullivan thought that Anderson and her husband, who time and again had demonstrated an inability to manage their own financial affairs, would somehow be capable of becoming successful entrepreneurs and able to

manage and operate a small business.  Not surprisingly, they demonstrated they were not up to the task.

Sullivan also testified that he believed Culligan to be a good business opportunity.  In particular, he testified that he believed the local franchise, which had not been a roaring financial success in the past, was underdeveloped relative to the potential market and that there was an opportunity for growth. But, even if this potential existed, which is questionable, the court has trouble understanding why this investment with all of the risks of small business ownership was a better idea for Anderson than taking the $120,000 that  Sullivan pumped into the business, investing that money conservatively in short-term investments, and then using the money to assist Anderson in getting out from under her IRS problems.

The court concludes it need not ponder too long over these issues, however, because Anderson failed to object to the purchase of Culligan within a reasonable time after being made aware of its purchase.  If she had done so, the court would have been more sympathetic with respect to her request that the court order the transfer of Culligan to Sullivan and that she be reimbursed for her losses.  Instead, Anderson and her husband embraced the purchase of Culligan, involved themselves in its operation for almost two years, and eventually assumed responsibility for its day-to-day operation.  At some point, Anderson is also  accountable for her actions; this point has long since been crossed with respect to Culligan.

Nevertheless, it does appear that Anderson has incurred substantial losses with respect to Culligan that she likely will not be able to recoup.  Some of these losses are the result of her and her husband's excessive spending on the business, but not all.

**Sullivan makes other repayments to the Trust in addition to the Culligan**

44.     As already noted, Sullivan used money from the sale of DIA to purchase Culligan on the Trust's behalf for $95,000 in November 2001.  At the same time, he also transferred  $15,000 into Culligan's account for operating funds.

45.     Later, in 2002, Sullivan made two cash payments to the Trust from the proceeds of the sale of DIA. The first payment was made on or about April 15, 2002, in the amount of $25,000. The second payment was for $30,000, which was deposited in the Trust's account on August 26, 2002.  Whether coincidence or not, the actual date on the $30,000 reimbursement check  is the same date that Sullivan and his wife signed the deed for Andersons' purchase of Sullivan's residence and two days prior to the closing of the purchase.  These repayments are not disputed by Anderson.

46.     On May 21, 2002, Sullivan wire transferred another $10,000 from the proceeds from the sale of DIA to Culligan's account.  Presumably, this was for additional operating expenses, but no explanation was given for this transfer.

**Sullivan's April 2003 trip to Williston and partial disclosure of past self-dealings**

47.     In  April 2003, Sullivan traveled to Oregon at Anderson's request to check on the property in Medford that had been acquired by the Trust.  En route, he stopped in Williston to take care of some tribal court business and also to visit with the Andersons.  During this visit, he handed Anderson a sheet of paper (Ex. D-118) that read as follows:

Summary of monies out and back in to the McCormick Trust for protective purposes:

From CJ McCormick Trust acct # 14-08-44094 Gate City Federal Bank Williston, ND

| | | | |
|---|---|---|---|
| January 31, 2001 | Check #261 | Dakota Internet Access | $100,000.00 |
| March 14, 2001 | Wire trf out | Escrow Acct (Fla prop) | 58,716.40 |
| | | | $158,716.60 |

From DIA (GPS & NMS) money market acct #701-7858 American State Bank, Williston, ND

| | | | |
|---|---|---|---|
| November 15, 2001 | Wire to Dowson | Culligan of Williston purchase | $95,000.00 |
| November 16, 2001 | Wire to | Culligan of Williston ASB acct | 15,000.00 |
| April 15, 2002 | Check #1009 | CJ McCormick Trust | 25,000.00 |
| August 24, 2002 | Check #1019 | CJ McCormick Trust | 30,000.00 |
| | | | $165,000.00 |

Accompanying this sheet were several pages of supporting documents.[25]

This was the first time that Sullivan disclosed to Anderson that he had commingled Trust property with his own personal assets and, as discussed earlier, he claimed he did it for "protective purposes." Anderson did not raise any particular objections at that point, possibly because it appeared from what Sullivan represented to her that she had been made whole on a gross basis. Also, as of that date, Anderson and her husband still had some hopes for Culligan.

Notably, however, Sullivan did not disclose the fact that there had been other commingling of funds. Nor did he disclose the fact that he had sold DIA and had made a substantial gain. On cross-examination, Sullivan testified the reason he did not say anything about the other times he had used Trust money was because the other transfers were not for "protective purposes," but this simply begs the question of why it was necessary at that point to limit the disclosure to only these

---

[25] The summary of the "outs and ins" does not mention the wire transfer from the account holding the proceeds from the sale of DIA to Culligan on May 21, 2002, in the amount of $10,000, even though this transfer was between the two dates of checks written to the Trust in 2002 and even though Sullivan counted other transfers to Culligan. The transfer is listed, however, in the Quickbooks records for the Trust as an item to be credited against the amounts owed the Trust and a barely legible copy of the wire transfer receipt accompanying the May 2002 bank statement is contained in Ex. P-23, which is the records for the American State Bank account that Sullivan used to receive the proceeds from the sale of DIA.

transactions.  The more credible explanation is that, by April 2003, Sullivan was looking to disengage himself as a trustee and knew that he had problems relative to his having commingled the Trust's funds with his own and potentially also a problem with respect to DIA.  By limiting the presentation to the selected transactions and presenting the data in the manner in which he did, *i.e.*, not just listing the transactions but totaling them up to demonstrate the Trust was ahead, he was hoping to stave off a closer examination of the Trust's affairs.

48.     Within a month of the April 2003 meeting in Williston, Anderson e-mailed Sullivan and, for one of the few times during Sullivan's administration of the Trust's financial affairs,  asked what the Trust's current bank balance was and also asked, "What's going on other than what you've told me."  While these statement were made in the context of a temporary cash shortage in the account, it had just been disclosed to Anderson that Sullivan had been using Trust money for his own benefit and  the credible evidence is that Anderson's blind faith in Sullivan had begun to wane and that she was becoming suspicious that he may not have been always acting in good faith or in her best interests.

**Discovery that the Trust may have expired**

49.     In late 2003, the parties discovered that the Trust may have expired several years earlier in 2000, according to the terms of the initial Trust instrument.  But, at all times material to this case, the parties acted as if the Trust was in place even if it may have expired.

Sometime after this action was initiated, Anderson obtained an order from a North Dakota state district court continuing the Trust for a  period of time sufficient to allow its affairs to be wound up, including the prosecution of this action.

**February 2004 Florida visit, Sullivan's decision to retire, and Sullivan's claim of agreement**

50.     In late February 2004, Anderson again traveled to Florida and stayed with the Sullivans for two weeks, from approximately February 28 to March 8. During this visit, Sullivan advised Anderson that he was going to retire and that he would assist in any transition that would be required, both in terms of financial administration of the Trust and the bookkeeping for Culligan. He stated he would secure a complete audit and that, if it showed he owed her money, he would make good on it. He also stated that he hoped that Anderson would be fair with him in terms of providing some compensation for his services over the years and that he would be holding back $10,000 of the Trust's funds for completion of the audit, which he said probably could not begin for several months because of the difficulty of finding someone until after tax season.

Sullivan claims that Anderson agreed to proceed in this fashion and that she breached this agreement by filing this action.  While the court believes there were discussions about these topics, there is no credible evidence that Anderson made a binding agreement that involved a waiver of her rights to pursue legal recourse.  In fact, while Anderson was staying with the Sullivans, she called home and instructed her husband to find a good attorney because it looked as if they were going to have to sue.  And, by the time she arrived home, her husband had already made an appointment with plaintiff's counsel, and not long afterwards this action was commenced.

Sullivan points to letters and e-mails that Anderson sent him after Anderson's 2004 Florida visit that suggest business as usual in terms of their relationship and that, generally speaking, she was accepting of Sullivan's desire to quit and get things resolved.  While Anderson may have not been up-front regarding her intentions, the letters and e-mails are not sufficient for the court to conclude the existence of an agreement.   Further, it is not clear that Anderson had made any final

decision as to what she was going to do until she had discussed the matter with an attorney.  Also, it appears that ending her close relationships with the Sullivans was very difficult for Anderson and something she may well have vacillated over until the very end.

**Additional amounts claimed by both parties**

51.     Sullivan claims that, at the time of his termination as a trustee, he was owed money for a number of miscellaneous items that he paid for on the Trust's or Anderson's behalf.  The items are contained in exhibits D-119 and D-129.  However, it appears that certain of these items have been counted twice.  Also, some of the items appear to be in the nature of personal gifts that the court will not consider for reimbursement, such as theme-park tickets and associated expenses.  The following are the expenses that the credible evidence indicates Sullivan is entitled to reimbursement:

| Item | Amount |
|---|---|
| Connie Kahler bookkeeping  - various dates | $266.25 |
| Fed Ex/UPS -various dates | $227.08 |
| Postage - various dates | $854.46 |
| Computer software - various dates | $1358.56 |
| Airline tickets for Anderson's son - 12/18/03 | $586.50 |
| Fuel Oil for Medford, OR property - 9/18/03 | $698.00 |
| Norland Int - Bottled Water Manual - 9/04/03 | $220.00 |
| FSHS, Inc (parts for Culligan) | $235.24 |
| Travel expenses to inspect Medford, OR | $3529.68 |
| Cashier's checks to Anderson - various dates | $1300.00 |
| Total | $9380.41 |

The remaining expenses will not be considered either because of insufficient evidence or because they are of a nature that the court will not consider them for reimbursement.

52.     Anderson claims she is owed for a check written to Sullivan in 1992 for $1,377.62, which was classified as a receivable owed the Trust in the Quickbooks accounting.  The court finds the evidence insufficient to support this claim.  Likewise, Sullivan claims Anderson owes him $1,000 for a loan he allegedly made to her in 1996 for the purchase of a motor home. While Sullivan

wrote a check to Anderson for this amount in 1996, Sullivan on other occasions reimbursed himself

for other advances he made to Anderson.  And, with respect to other transactions during that same

time frame, he claimed an inability to recall the details of the transactions.  Based on this, the court

is not convinced the amount is still owed and concludes the evidence is insufficient to support the

claim.

**Nancy Sullivan**

53.     Nancy Sullivan was not privy to the details of Sullivan's financial management of

the Trust nor was she privy to many of the conversations that Sullivan and Anderson had about Trust

matters.  Consequently, she was not in a position to know what disclosures Sullivan had made or

failed to make over the years or what authorizations Anderson may have given.  In terms of the

particular conversions for which relief is being awarded, there is no credible evidence that Nancy

Sullivan participated in, or otherwise encouraged, the conversions.  She did participate in the loan

made to her business, but the credible evidence is that this loan was repaid with interest and that she

believed her husband had the authority to make the loan.

Nancy Sullivan was a co-purchaser of the Florida condominium along with her husband.

The credible evidence is that she did not have actual knowledge that Trust funds were used to make

the down payment on the date of closing, but she became aware of the fact shortly thereafter.  She

testified that Gary told her about the two large conversions in case anything happened to him.[26]

But, regardless of whether Nancy Sullivan had actual knowledge on the date of closing, she

obviously did not give any value for the substantial amount of Trust funds that went toward the

---

[26]  She also had knowledge of the summary of the "outs and ins" that Sullivan presented to the Andersons a
year later in Williston that disclosed Trust money being used for the down payment on the condominium.

purchase of the condominium.  Further,  the credible evidence is that the Sullivans did not have large amounts of cash sitting around when it came time to close on the condominium, particularly since this was prior to the sale of DIA.  Sullivan acknowledged that the only options they had for coming up with the down payment were placing a second mortgage on their California residence or liquidating their brokerage account. In fact, as the court has found, this lack of liquidity was the real reason for the 2001 conversions.  Consequently, given that Nancy Sullivan was both a co-purchaser and also a part owner of at least part of the Sullivan's joint property, she should have known that the money being used for the down payment was not their money.

**Miscellaneous findings**

54.     In making the conversions of Trust funds that are the subject of the relief being granted by the court in this case, Sullivan was acting in his capacity as a co-trustee and financial manager for the Trust.  He was not acting as an attorney.

55.     Sullivan in his counterclaim seeks compensation for all of his work as a trustee from December 1991 through March 2004 - a total of approximately 148 months.  More particularly, he claims he spent an average of 20 hours per month on Trust business and that he should be compensated at the rate of $50 per hour, which is the amount being charged by the professional trustee that has replaced him.  Based on these numbers, he seeks $148,000.

At trial, Sullivan offered no contemporaneously kept record of the actual time that he spent on Trust matters.  And, while the court believes he spent considerable time on behalf of the Trust over the years, the court finds Sullivan's estimate to be insufficient proof of the time spent.  Further, given the intermingling of personal affairs and Trust affairs that Sullivan continued to insist at trial was appropriate, the court is concerned that any estimate given by Sullivan over-estimates what time

42

was spend on the Trust as opposed to his own personal affairs.  Finally, the evidence offered by Sullivan provides the court with no means of distinguishing between the time he spent engaging in lawful acts and the time he spent in engaging in unlawful and fraudulent activity with respect to the Trust.

56.     During the time period relevant to this action, the Trust, which was originally created in California, owned property in California, Oregon, and North Dakota.  The North Dakota property included the Anderson's personal residence purchased from Sullivan, the B&B Building, and the local Culligan franchise.  Also, during most of the relevant time period, Sullivan resided in Williston, North Dakota , and administered the Trust's affairs from that location, including using a local bank account for handling most of the Trust's financial transactions.  And, even after Sullivan moved to Florida, the Trust continued to use its account at the Gate City Bank in Williston, and the Andersons soon moved to North Dakota and became more actively involved in the Trust's affairs by taking over the day-to-day management of Culligan.

The Trust instrument contains no choice-of-law clause.

## CONCLUSIONS OF LAW

**1.0   Choice of law**

**1.1     North Dakota conflicts law**

Federal courts are obligated to follow the choice-of-law principles of the forum state in diversity actions.  E.g., Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Brown v. Home Ins. Co., 176 F.3d 1102, 1105 (8th Cir. 1999).

The trust responsibilities that are the focus of this action are more defined by statute and generally accepted trust principles than the Trust instrument itself.  Consequently, this action sounds more in tort than contract.  But, in terms of North Dakota conflicts law, it probably does not make a difference.  This is because North Dakota has adopted a  "significant contacts" approach that applies the five choice-influencing factors propounded by Professor Leflar for both tort and contract actions that have multi-state factual contacts.  Consequently, while there are no North Dakota cases on point, North Dakota would apply its "significant contacts" approach to resolving choice-of-law issues in cases such as this in which relief is sought for breaches of fiduciary duties and there are multi-state factual contacts.  See  Nodak Mut. Ins. Co. v. Wamsley, 2004 ND 174, ¶¶ 1-13, 687 N.W.2d 226; see generally Robert A. Leflar,  Choice-Influencing Considerations in Conflicts Law, 41 N.Y.U.L.Rev. 267, 282 (1966).

**1.2	North Dakota law is the appropriate choice of law with one exception**

Applying the Leflar  five-choice influencing factors, the appropriate choice of law is North Dakota's, with exception,  for the following reasons:

- North Dakota laws relating to the obligations of fiduciaries and the remedies available for breaches of  fiduciary obligations are typical of those found in most other states. Consequently, "predictability of results," "maintenance of interstate order," and "application of the better law" are not significant factors.

- North Dakota has a "significant interest" in the enforcement of its laws in this case given that: the breaches of trust responsibilities took place in North Dakota; the trust owned significant real and personal property in North Dakota; and the principal location for administration of the Trust during most, if not all, of the time period

relevant to this action was in North Dakota.   For all of the same reasons, neither

California, Oregon, or Florida have the same degree of interest.[27]

- The Trust instrument does not contain a choice-of-law clause, and there are no special trust administration questions involved.

- "Simplification of the judicial task" favors application of North Dakota law for the court and for the parties, who are both represented by North Dakota counsel.

See also G. Bogert, The Law of Trust and Trustees § 294 (Rev. 2nd ed. 1995) ("Bogert").

North Dakota conflicts law recognizes that sometimes it is appropriate to apply different state laws to different aspects of the controversy depending upon the issue involved.   Nodak Mut. Ins. Co. v. Wamsley, 2004 ND 174 at ¶ 10.  In this case, Florida has the more significant interest with respect to what relief Anderson can obtain as to the Florida condominium, given not only that the property is located there, but also the fact it appears the condominium is the Sullivans' homestead and the strong interest that individual states have in preserving homestead protections for their citizens.  Also, there are questions regarding the court's jurisdiction over the Florida property.  Thus,

---

[27] In particular, Florida has some interest given that Sullivan now resides in Florida, but this move was made after the conversions of Trust money had taken place.  Moreover, Anderson moved to North Dakota about the same time Sullivan moved to Florida and the Trust's bank account remained in North Dakota.  Florida also has some interest given that converted Trust funds were used to assist in the purchase of the Florida condominium, which likely is now the Sullivans' homestead.  But, again, the conversions took place in North Dakota, and there is other property involved in this action that has no relation to Florida.  Thus, the only issue that Florida may have a greater interest in has to do with the remedy that is available as to the Florida condominium.

Likewise, California has some interest given that the Trust owns property in California and the Trust was created there.  The California property, however, was not directly involved in the conversions.  In particular, the royalty income from the California gas wells, which was the Trust's principal source of income, had been deposited in a North Dakota account before the conversions took place.   In fact, by the time of the events relevant to this action, the location of the administration of the Trust had shifted from California to North Dakota and neither Anderson nor Sullivan were residing in California. Finally, the validity of the Trust is not an issue that needs to be resolved in this action and, in any event, the North Dakota state courts have now asserted jurisdiction over the Trust.

Finally, Oregon has an even lesser interest even though the Andersons were living there during the time the conversions of Trust assets took place.  The bulk of the Trust's assets were located elsewhere, the Trust was being administered in North Dakota, the conversions of Trust property took place in North Dakota, and the Andersons eventually moved from Oregon to North Dakota.

while North Dakota law applies to determine, for example, whether there has been a breach of fiduciary responsibilities, whether the proceeds from the conversions can be traced to the Florida property, and the remedies generally available to Anderson (including specifically the imposition of any monetary judgments against the defendants), the court will look to Florida law for any restrictions upon the enforcement of the available remedies as to the Florida condominium and what impact a claim of homestead protection may have.

### 2.0    Sullivan's liability

### 2.1    Law prohibiting self-dealing by a fiduciary

A bedrock principle of trust law is that a trustee may not use trust funds for his own benefit - at least not without the express consent of the beneficiary and then only upon full disclosure. E.g., Burlington Northern and Sante Fe Ry. Co. v. Burlington Resources Oil & Gas Co., 1999 ND 39, ¶¶ 17-30, 590 N.W.2d 433;  Hill v. Hanna, 222 N.W. 459, 462 (N.D. 1928); N.D.C.C. §§ 59-01-09 - 51-01-16; see generally Restatement of Trusts (Second) §§ 179-180 (1959); A. Scott & W. Fratcher, The Law of Trusts § 170.17 (4th ed. 1988) ("Scott"); 76 Am. Jur. 2d Trusts §§ 351, 469 (2007).   In fact, the prohibition against self-dealing by fiduciaries is "[o]ne of the *most stringent* precepts in the law." Burlington Northern and Sante Fe Ry. Co.,1999 ND 39 at ¶ 17 (emphasis added).  It is *per se* fraud under North Dakota law.  N.D.C.C. § 59-01-15.

### 2.2    Sullivan liable for self-dealing and conversion of Trust assets

In this case, the evidence is overwhelming that Sullivan engaged in self-dealing with respect to the Trust's property.  Moreover, he did it not just once, but on a number of occasions and over an extended period of time.

The relief that the court grants in this case is based solely upon Sullivan's acts of self-dealing.  It is <u>not</u> based upon the evidence that suggests Sullivan may have acted imprudently with regard to certain "investments,"such as the purchase of Culligan,  nor is it based on the quality of the advice he may have given Anderson regarding her federal tax liens.

**3.0     Sullivan's defenses**

**3.1     Defense of breach of co-trustee obligations**

One of Sullivan's defenses is his argument that Anderson, as a co-trustee, had the same responsibilities for administration of the Trust as Sullivan, including a duty to keep herself fully advised as to the affairs of the Trust.  What this has to do with Sullivan taking Trust assets that did not belong to him is not exactly clear, but, apparently, the theory is that she could have prevented what occurred had she been more active and diligent.

In making this argument, Sullivan glosses over the fact that he voluntarily arrived at an accommodation with Anderson whereby he assumed primary responsibility for financial administration of the Trust as discussed in more detail in the court's findings.  And, while there may be situations in which it is improper for a co-trustee to delegate his or her responsibilities to another co-trustee, the situation is different here because Anderson was the sole beneficiary.  In fact, the primary purpose for the Trust and Anderson asking Sullivan to become involved as a trustee was that she wanted, and perhaps needed, someone else to manage her financial affairs and to protect her from her spendthrift ways. Consequently, the division of responsibility that occurred in this case appears to be permissible since all of the interested parties to the trust relationship agreed to it.  <u>Cf.</u>

Scott § 194.  Whether the relationship that existed was sufficient *vis-a-vis* third parties to create a legal versus a sham trust is a different issue that the court need not address.[28]

In other words, Sullivan voluntarily entered into a relationship of personal confidence with Anderson pursuant to which he agreed to undertake certain fiduciary responsibilities with regard to her property.  And, he not only voluntarily entered into the relationship, he fostered and promoted it, including going so far as to set goals for his administration of Anderson's financial affairs based on his trial testimony.  This alone was enough to create an implied trust relationship and impose fiduciary duties pursuant to N.D.C.C. § 59-01-08.[29]  See, e.g., Manikowske v. Manikowske, 136 N.W.2d 457, 464 (N.D. 1965); cf. Burlington Northern and Sante Fe Ry. Co., supra.  The formal Trust document was not needed.[30]

Moreover, not once during the time that Sullivan acted as a co-trustee did he ever tell Anderson she was not living up to her end of the deal or that she was violating her responsibilities - which, if anything, as  co-trustee were to herself and not to him - and not once did Sullivan seek to withdraw from the relationship for that reason.  Rather, the evidence is that Sullivan was perfectly

---

[28]   The court makes no judgment about the validity of the Trust *vis-a-vis* third parties, and nothing in the court's decision or handling of this matter should be construed as placing a cloak of legitimacy on the Trust.

[29]  N.D.C.C. § 59-01-08 reads as follows:
    §59-01-08.  One assuming relation of personal confidence is trustee.  Everyone who voluntarily assumes a relation of personal confidence with another is deemed a trustee within the meaning of this chapter not only as to the person who reposes such confidence, but as to all persons of whose affairs the person thus acquires information which was given to the person in the like confidence, or over whose affairs the person, by such confidence, obtains any control.

[30]  Although both sides pointed to provisions of the  Trust document when it was to their advantage and ignored it when it was not, the court's findings are that both parties acquiesced to a situation where certain of the Trust's formalities were ignored.  In reality, this case may have more to do with the relationship of trust with a small "t" that was created when Anderson entrusted the administration of her financial affairs to Sullivan, than it does with the administration of the formal trust.

content with Anderson not asking a lot of detailed questions about the financial details of the Trust leaving him free to loan money to family, friends, and the other trust he was administering and to use the Trust funds for his own benefit.

### 3.2    Defense of expiration of the Trust terminating fiduciary duties

Another Sullivan defense is his argument that the Trust expired by its own terms in 2000 after Sullivan had already converted some of the Trust's funds, but before the conversions that occurred in 2001, and that this ended his fiduciary responsibilities. The court need not decide, however, whether the Trust expired or whether it was lawfully continued by the conduct of the parties after the expiration of its nominal term.  This is because Sullivan's fiduciary obligations to Anderson continued in any event.

As the court has found, the parties treated the Trust as being in effect at least until the discovery in late 2003 that it may have expired. Consequently, if the Trust had expired in 2000, the relationship that continued was that of a resulting trust.  See generally 76 Am. Jur. 2d Trusts §§ 135, 142 (2007).  But, even if not, Sullivan's fiduciary responsibilities continued pursuant to the relationship of personal confidence that had developed relative to his handling of Anderson's financial affairs as already discussed.

### 3.3    Defense  of prior authorization for commingling of Trust funds

Another of Sullivan's defenses is that he had a general, verbal understanding with Anderson that he would "protect" her assets from IRS levy and that this authorized him to self-deal in the Trust's funds.  The court has found, however, that Sullivan at no time obtained express authorization for his personal use of the Trust funds in advance.  Rather, the evidence is that any disclosure came after-the-fact and even then was misleading and incomplete.  Consequently, even if  Sullivan had

the general verbal understanding he claims,  it did not provide him with the explicit authorization the law demands before a trustee can self-deal in trust assets.  E.g.,  Burlington Northern and Sante Fe Ry. Co., 1999 ND 39 at  ¶¶ 17-30 (rejecting the same defense in a case between two sophisticated commercial parties where arguably the delegated authority was much more explicit); see generally 76 Am. Jur. 2d Trusts § 469 (2007).

**3.4     Defense of after-the-fact consent to commingling of Trust funds**

Still another of Sullivan's defenses is that Anderson acquiesced to his conversions of the Trust funds after-the-fact.  As discussed in more detail in the court's findings, Sullivan advised Anderson that he had purchased Culligan and the B&B Building for the Trust during her visit to Florida at the end of 2001, but did not mention at the time the source of the funds and "neglected" to disclose that he himself had been using Trust money for his own purposes.  The first time that he explicitly advised Anderson that he had used Trust money for his own purposes was in April 2003 when he presented Anderson with the summary of the "outs and ins."

N.D.C.C. § 59-01-09 requires that trustees act in the "highest good faith" and prohibits obtaining any advantage over a beneficiary "by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind." N.D.C.C. § 59-01-16 further provides that any transactions by a trustee to obtain "any advantage from the trust's beneficiary are presumed to be entered into by the latter without sufficient consideration and under undue influence."

The summary of the "outs and ins" that Sullivan presented to Anderson in April 2003 was not made upon a full disclosure.  In particular, Sullivan did not disclose the fact that he had made a number of earlier conversions of money, including specifically money that he put in DIA in 1997. Further, he did not disclose the substantial gain that he had earned on the sale of DIA.  Finally, the

50

manner in which Sullivan presented the summary of "outs and ins" was misleading. Not only was it incomplete, but it also suggested that he had restored more in value than he had actually taken. As the court noted earlier in its findings, Anderson raised no particular objection upon receiving the summary of the "outs and ins," but probably because it appeared she was ahead and becaue she still had hopes for Culligan's success.

Under these circumstances any claim of agreement or acquiescence to the conversions fails both factually and legally. Sullivan's attempt to obtain Anderson's acquiescence with his incomplete and misleading summary presentation of the "outs and ins" violated § 59-01-09. And, for the same reasons, Sullivan has not only has failed to rebut the presumptions of lack of consideration and undue influence under § 59-01-16, the court concludes he was not acting in good faith when he attempted to gain Anderson's agreement.

### 3.5    Defense of breach of agreement to abide by results of an independent audit

In still another attempt to avoid liability, or at the very least limit the scope of Anderson's relief, Sullivan argues that he reached an "agreement" with Anderson in March 2004 upon his retirement that he would retain a CPA to review the books, that Sullivan would reimburse the Trust for any amounts found to be due and owing as result of the CPA's examination, and that Sullivan would hold back $10,000 of the Trust funds to pay for this accounting.

For the reasons already discussed in the findings of fact, the court concludes there was no binding assent by Anderson to this purported agreement. But, even if there was, the court would not enforce it for the same reasons expressed above with respect to Sullivan's claim of acquiescence. By 2004, Sullivan still had not fully disclosed the extent of his defalcations or the gain that he earned on DIA. Sullivan's attempt to obtain an agreement in 2004, which he now claims limits his

liability and the scope of Anderson's relief, was clearly an advantage Sullivan was not entitled to obtain given his obligations under N.D.C.C. § 59-01-09.  Further, Sullivan again has not only failed to overcome the presumptions of lack of consideration and undue influence under N.D.C.C. § 59-01-16, the court concludes that solicitation of this purported agreement was also not in good faith.

It goes without saying that an agreement that is without sufficient consideration, that lacks the necessary consent because it has been obtained under undue influence, and that is in violation of the law is unenforceable.  N.D.C.C. §§ 9-01-02; 9-03-3; 9-05-04, 9-08-01.

### 3.6     Defense of acceptance of the Culligan purchase and entitlement to offset

Finally, Sullivan argues that Anderson is barred from making any recovery with regard to his purchase of Culligan for the Trust.  The court agrees.

Anderson acknowledged that she first learned of the Culligan purchase during her Florida visit with Sullivan at the end of 2001.   In the late spring of 2002, Anderson and her husband traveled to North Dakota to make an inspection of the business pursuant to Sullivan's suggestion that they move to North Dakota and take over its operations.  After making the inspection and being satisfied, they moved to Williston in August 2002 and eventually assumed day-to-day responsibility for the running of Culligan - all without any contemporaneous protest that the purchase should not have been made or that Sullivan breached his duties in making the purchase.  It was not until this action was filed in state court in April 2004, that Anderson complained about Culligan.

Under these circumstances, the court agrees that Anderson acquiesced to and accepted Culligan's purchase, and that this now bars her from seeking relief with regard to this transaction. See generally Scott at § 218; 76 Am. Jur. 2d Trusts § 651 (2007). Further, as noted in the court's

findings, Sullivan purchased Culligan for the Trust with a portion of the proceeds from the sale of DIA and made two transfers of additional funds to Culligan for operating capital.   Under the circumstances, the court further concludes it would be unfair not to charge the Trust and Anderson with the value of what has received.

At this point, the only real evidence that the court has regarding the value of Culligan at the time of its purchase is Sullivan's testimony that he believed the business was worth about what he paid for it, or slightly more.   Hence, the court will allow as an offset against the amounts Sullivan owes Anderson:  the $95,000 purchase price that was paid on November 15, 2001; the $15,000 that Sullivan placed in Culligan's bank account for operating capital on or about the same date; and the additional $10,000 that Sullivan placed in Culligan's account on May 21, 2002.

### 4.0.   <u>Award of relief to Anderson</u>

### 4.1   **Remedies available to a trust beneficiary**

Generally speaking, the remedies that a beneficiary has  against a trustee who wrongfully uses Trust funds include:  imposition of a constructive trust over the proceeds and products of wrongfully converted trust assets; recovery of any gain resulting from the use of the converted assets or damages for the value of the use of the trust assets;  the imposition of an equitable lien over proceeds from the converted trust assets to secure amounts determined to be owed the beneficiary; and/or an accounting to assist in the tracing of the trust property for purposes of imposition of a constructive trust or an equitable lien and to determine the extent of the loss resulting from the wrongful conversion of trust property.   <u>Hill v. Hanna</u>, <u>supra</u>; N.D.C.C. § 59-01-10; <u>see</u> <u>generally</u> Restatement of Trusts (Second) §§ 197-207 (1959); <u>Bogert</u> at §§ 861-871.

**4.2.     Award for converted Trust funds traced to DIA**

**4.2.1   Right to recover share of  gain from DIA sale**

Anderson seeks an award of a portion of the sales proceeds of  DIA because of the Trust money that she was able to trace as having gone into DIA.   Under well-established principles of trust law, a trustee who wrongfully uses trust property for his own benefit can be required to account to the beneficiary for all profits earned on the trust property.   The North Dakota Supreme Court has described the general rule as follows:

> It is elementary that a trustee may not make use of trust property for his private or individual purpose or to derive any profit therefrom; if he uses such property for his own benefit and any loss occurs, the loss must be borne by the trustee; and if he derives any profit therefrom, the beneficiary has the right to demand the profit actually realized by the trustee, or interest on the principal sum.

Hill v. Hanna, 222 N.W. at 462.  And, in North Dakota, the right of a beneficiary to recover the profits earned is expressly provided for by statute and, just as significantly, is at the option of the beneficiary.  In particular, N.D.C.C. § 59-01-10 states the following:

> 59-01-10.  Trustee shall not profit by use of property.  A trustee shall not use or deal with the trust property for the trustee's own profit or for any other purpose not connected with the trust. If the trustee does so, the trustee, at the option of the beneficiary, may be required to account for all profits made thereby, or to pay the value of the use of the trust property, and, if the trustee has disposed thereof, to replace it with its fruits or to account for its proceeds with interest.

Sullivan argues that awarding Anderson a share of the proceeds from DIA's sale is not permissible because he intended his use of the funds to be a loan and not an equity investment.  The law, however, does not allow the person wrongfully using the funds to control the remedy by imposing his own characterization of the conversion of the funds.  It is sufficient to support an award of a share of the profit, that Sullivan wrongfully used Trust funds in his business.  See, e.g., Bird v. Stein, 258 F.2d 168, 177-178 (5th Cir. 1958); Tauber v. Com. ex rel. Kilgore, 562 S.E.2d 118 (Va.

2002);  In re Eisenlohr's Estate, 102 A. 115, 117 (Pa. 1917); Boston & Colorado Smelting Co. v. Reed, 48 P. 515, 518- 519 (Colo.1897);  see generally Restatement of Trusts (Second) § 202, cmt. h (1959);  Scott at §§ 170.17 & 206.

### 4.2.2   Trust's share of the gain from DIA sale

The commingling of funds relative to DIA can be broken down into two categories.  The first category are those amounts of Trust funds that can be directly traced as having gone into DIA and that were not repaid or otherwise specifically transferred out of DIA prior to the sale.  In this first category, there are the following two transfers of Trust funds:

- $4,500 of Trust money went into DIA on November 13, 1997.

- $65,000 of Trust money went directly into DIA on January 26, 2001.  The actual amount deposited was $100,000, but $35,000 was transferred the same day to Sullivan's personal account.

The second category is the Trust funds that appear to have been used for some other purpose, but  which the reconstructed Quickbooks records eventually treated as being receivables owed to the Trust by DIA under the category "dia.net."  This second category of items includes the following transactions, the details of which have been discussed earlier:

- "$6,647.90 Transfer to the Edward Jones Account."

- "$5,306.59 Transfer for GPS Client."

- "$9,480.93- Misapplied Royalty Checks."

- $35,000 of the $100,000 transferred to DIA in January 26, 2001, and which was re-transferred the same day from DIA to Sullivan's personal account.

- $56,716.40 transfer of Trust funds for the down payment on the Florida condominium.

In terms of deciding what amount of the Trust's funds the court should count as contributing to the gain realized from the sale of DIA, one approach would be to take all of the un-reimbursed amounts from both categories that the Trust's Quickbooks show as being related to DIA and not repaid at the time of the sale. At the end of October, 2001, this amount is $175,130.69 as evidenced by Ex. D-119 plus an additional $2,250.85 to correct for an obvious accounting error as previously discussed, for a total of $177,381.54.

Anderson's expert accountant testified to a more conservative approach. He considered everything shown in the Trust's accounting as being a receivable owed by "dia.net" prior to the sale of DIA, except for the $56,716.40 for the condominium purchase. In other words, as indicated by the summary of his calculations received as Ex. P-97, Anderson's expert added together the $18,414.29 of Trust funds used prior to 2001 to the $100,000 transfer on January 26, 2001, to come up with $118,414.29 as being the amount of Trust money going into DIA. Later, he adjusted this figure to add an additional $2,250.85 to correct for the accounting error in Quickbooks, making his new total $120,665.14.

The approach the court believes it should take, however, is to look only to the transfers that can be directly traced into DIA's operating account, which is the first category of transfers set forth above. In other words, the court will consider only the $4,500 that went directly into DIA on November 13, 1997, and $65,000 of the $100,000 that went into DIA's account on January 26, 2001, because the remaining $35,000 was transferred out the same day to Sullivan's personal account.

This produces a total of $69,500 of Trust money that the evidence establishes went into DIA, was used in the business, and was not otherwise reimbursed prior to the sale of DIA.

In determining the Trust's share of any gain of DIA, Anderson's accountant concluded that the only evidence of direct contributions by Sullivan that he could uncover was a total of $51,498. Comparing this to what he calculated as the Trust's investment in DIA of $120,665.14, he came up with a split of the DIA sale proceeds of approximately 70% to the Trust and 30% to Sullivan.

Sullivan testified that the amount used by Anderson's expert for the amount of his contribution to DIA was too low because it did not reflect other amounts he contributed. And, based on the evidence, the court is skeptical of the amount used by Anderson's expert, particularly since he did not make any examination of DIA's records and based his opinion upon deposition testimony as to the contributions and depreciation schedules in Sullivan's tax returns.

On the other hand, the only evidence offered by Sullivan on this point was his testimony as to the calculation that he had made of his basis in DIA when it came time to report the gain from the sale on his tax returns. Sullivan testified that he sat down at that time and did the best he could to determine the total of all of the cash outlays he had made for the business and came up with an amount of $300,000, which by all appearances was a mere estimate and likely inflated. Notably, Sullivan did not offer any accounting records or expert witness testimony to verify his claimed contributions, much less indicate the timing of the individual outlays. In fact, the only specific evidence offered by either party of outlays by Sullivan prior to the $4,500 transfer of Trust funds to DIA in November 1997 was the evidence that Sullivan had invested $1,000 and spent another $11,500 to purchase the investments of his initial partners.

While the court believes that the $300,000 figure testified to by Sullivan may be inflated and too generous, it is the only evidence left for the court to consider having rejected Anderson's expert's number.  Morever, Sullivan cannot complain about the $300,000 given his testimony and the fact he certified it as being accurate when he submitted his tax return.  Finally, while there may be a good argument that Sullivan's $300,000 estimated basis must necessarily include the Trust's $69,500, the court will consider it to be separate.  Consequently, the court determines that the split of the gain from the sale of DIA should be 82.8% to Sullivan and 18.8% to the Trust.

### 4.2.3   Total award for converted Trust funds traced to DIA

As detailed earlier in the findings of fact, the total amount realized on the sale of DIA was $805,000 with respect to which Sullivan's basis or contribution was no more than $300,000.  Adding the Trust's $69,500, the court comes up with a total basis for both parties of $369,500.  When this amount is subtracted from the amount received from the sale of $805,000, the net gain is $435,500, and the Trust's 18.8%  share is $81,874.  And, since the Trust is entitled to recover back the amount initially converted plus the gain, the total proceeds from the sale of DIA that should have gone to the Trust is $151,374.[31]

### 4.2.4   Defenses against sharing the DIA gain

Sullivan argues that any award of a share of DIA's gain to Anderson is fundamentally unfair for two reasons.  First, he argues that the bulk of the Trust money that went into DIA went in late in the game and did nothing to enhance the value of the company.  In particular, he presented testimony from an expert accountant who opined that the Trust's January 2001 contribution likely

---

[31]   One arrives at roughly the same amount by multiplying 18.8% times $805,000, which is the methodology employed by Anderson's expert, even though he used different percentages and numbers.

did not contribute to any increase in the sales price upon his review of the last couple of years of operating results for DIA.  But, following this logic, it would be necessary to value the company each time the parties made a contribution and then weight the contributions accordingly.  Sullivan cites no authority for this proposition and the court is not aware of any such requirement in this context.  Further, the court rejects Sullivan's expert's testimony that the Trust's contributions had essentially no value in terms of the ultimate market value of the company, even assuming this to be a valid criteria, since the market value on the date of sale could have been significantly less if DIA did not have sufficient funds to maintain the necessary level of operations leading up to the sale. Finally, Sullivan's expert completely ignored the much earlier injection of $4,500 of Trust money, which relative to Sullivan's contribution at that point may have been even more substantial than the percentage split the court now arrives at.[32]

If Sullivan suffers some disadvantage relative to the timing, he has only himself to blame. He had the choice of using his own money instead of breaching his fiduciary obligations and using Trust assets.  Moreover, the burden is upon Sullivan to properly account for any profits earned on the converted Trust property. And, more particularly here, where he has commingled the converted Trust money in his own business and sells the business for a gain, the burden is upon him to establish what part of that gain he is entitled to keep and what part rightfully must be paid to the Trust.  See Tauber v. Com. ex rel. Kilgore, 562 S.E.2d at 129; Engstrom v. Larson 44 N.W.2d

---

[32]  As indicated earlier, the only concrete evidence of Sullivan's contribution as of the time the Trust's $4,500 was injected into the business in 1997 was that he had made an original $1,000 contribution along with three others and that he had bought out the other three $1,000 contributions  - one for $1,500 and the other two for $5,000 each.  And, it is conceivable that, prior to the injection of the Trust's funds in 1997 of $4,500, Sullivan had injected no more cash and the business was self-sustaining during that period.  If so, the Trust's percentage share in 1997 would likely have been significant, and, thereafter, both Sullivan's share and the Trust's share would be entitled to claim their proportionate shares of any increases in the retained earnings or other increases of assets.  See Byrne v. McGrath, 62 P. 559, 560 (Cal. 1900).

97,109 (N.D.1950); Boston & Colorado Smelting Co. v. Reed, 48 P. at 519; 76 Am. Jur. 2d Trusts §§ 281-282, 378 (2007).[33]  Since Sullivan presented the court with only the total dollar figure of his contributions to the gain produced by the sale of DIA, he cannot complain about the court not having considered some other analysis, such as considering the  timing of the cash injections relative to the buildup of any retained earnings.

Finally, Sullivan argues that he has also invested substantial "sweat equity" and that any award of a share of DIA to Anderson is unfair for this reason as well.  Again, Sullivan had the opportunity to present some other analysis that may have attempted to capture this if he believed it relevant, but chose not to do so.  And, there may be a very good reason why he did not.  First, DIA employed others in the running of its operations whose salaries were paid by DIA, including his son-in-law who was the manager.  Second, and more importantly,  Sullivan regularly took money out of DIA.  Exhibit P-37, which covers only the time period from 1997 to the time of the sale, shows that Sullivan regularly wrote checks to himself from DIA's account and that the total of the checks during this time period and prior to the sale was slightly more than two hundred thousand dollars.  While some of this may have been for reimbursement of expenses, and $35,000 of it was Trust

---

[33]  In Tauber v. Com. ex rel. Kilgore, the Virginia Supreme Court explained the principle as follows: On remand, the chancellor was required to fix the amount of JMHI's assets held by the defendants as trustees in dissolution of the charity. As the successful proponent of the constructive trust, the Commonwealth bore the initial burden on remand of tracing JMHI's assets and establishing the amount of its intangible assets. See Crestar Bank, 250 Va. at 204, 462 S.E.2d at 335-36; Watts v. Newberry, 107 Va. 233, 240, 57 S.E. 657, 659 (1907). However, to the extent that the defendants commingled their own property with JMHI's assets and sought recovery of such property, they had the burden of proving how much of the commingled funds they owned personally. See Brown v. Coleman, 318 Md. 56, 566 A.2d 1091, 1097 n. 7 (1989); Bass v. Smith, 189 Md. 461, 56 A.2d 800, 805 (1948); MacBryde v. Burnett, 132 F.2d 898, 900 (4th Cir.1942); V Austin W. Scott & William F. Fratcher, The Law of Trusts § 515, at 609 (4th ed.1989). The defendants bore this evidentiary burden because when trustees conduct their affairs in a manner that prevents a precise accounting of trust assets, the trustees, rather than the trust, must suffer the consequences. Am. Nat'l Bank v. Ames, 169 Va. 711, 750, 194 S.E. 784, 798 (1938); see Royall v. Peters, 180 Va. 178, 189, 21 S.E.2d 782, 787 (1942); First Nat'l Bank v. Commercial Bank & Trust Co., 163 Va. 162, 175, 175 S.E. 775, 779 (1934). Tauber v. Com. ex rel. Kilgore, 562 S.E.2d at 129.

money from the $100,000 deposit that he immediately transferred to his own account, the regularity of the payments indicate he was compensating himself as he needed money.  In fact, a more detailed consideration of the payments might result in the conclusion that the Trust's share of the gain is understated for this reason alone.

In summary, with respect to the converted amounts of $4,500 in November 1997 and $65,000 in January 2001, Anderson has elected to collect this money back plus the gain earned on these sums, as is her statutory right, in lieu of demanding the principal of these amounts plus interest from the dates of the conversions based on an equitable rate as determined by the court.  The total amount of Trust's share of the proceeds from the sale of DIA as a consequence of these conversions is $151,374.

### 4.2.5   Offset for amounts related to Culligan

Soon after Sullivan sold DIA, he took money from the proceeds of the sale and purchased Culligan.  For reasons already discussed, Sullivan is entitled to offset the amounts he paid and otherwise invested in Culligan.  Consequently, the court will immediately offset from the $151,374 representing the Trust's share of DIA's sales proceeds and without consideration of interest, the $95,000 paid by Sullivan for the purchase of Culligan and the $15,000 he placed into Culligan's account for operating purposes.  Both of these amounts were paid within 45 days of the date of the closing of the sale of DIA.  Also, the court will offset the additional $10,000 that Sullivan later placed in Sullivan's Culligan operating account in May 2002, prior to any consideration of prejudgment interest.  Consequently, with these offsets, the remaining amount due relating to the initial conversions of the $4,500 and the $65,000, plus the gain on those conversions, is $31,474.

As to this net amount, since Anderson has elected to pursue the gain rather than damages for the value of the wrongful use of the money (which has a different interest component to it for reasons discussed later herein), the court believes the more appropriate rate of interest is the prejudgment rate allowed by North Dakota law for breach of an obligation not arising from contract, which is any rate in the discretion of the court or the jury up to a current maximum rate of six percent.  Patch v. Sebelius, 349 NW2d 637 (ND 1984); N.D.C.C. §§ 32-03-05 & 47-14-05; NDJI C - 74.60 (1997).  In this case, the court will allow interest at the rate of 6% from and after January 1, 2002, even though the bulk of the proceeds from the DIA sale were received prior to that date.

### 4.3    Request for accounting relief

Part of the relief that Anderson seeks in this case is a full accounting.  And, to date, Sullivan has not presented a full accounting even though he has had every opportunity to do so both prior to and during this action.[34]  Consequently, most of the meaningful accounting relief that Anderson has obtained so far has been by way of discovery.  And, that discovery uncovered a number of

---

[34]   Sullivan retained a CPA and certified fraud examiner to perform what he termed "limited specific audit procedures," which were defined by counsel and which were  limited to the period from January 2000 through March 2004.  The limited audit procedures essentially amounted to tracing income going into the Trust to show that it was all accounted for in the Trust's Quickbooks records and to show that a number of Trust checks made out to Sullivan corresponded to the purchase of cashier's checks that were sent to Anderson.  Notably, he was not asked to perform a full audit or accounting.  For example, he did not go back into the time period of 1994 to 2000, even though discovery in the action disclosed there were conversions of Trust funds during this time frame that Sullivan had not previously reported.  Further, even as of 2000, he made no attempt to sort out the rather confusing status of the "receivables" that the Trust's accounting records showed as being owed as of January 2000 to determine whether they were legitimate, whether they had been properly accounted for, and whether the entries made after that date were proper.

Sullivan's excuse for limiting the time period of the "analysis" of his expert was that Anderson's complaint only alleged conversions occurring after January 2000.  The pleadings, however, also requested a full accounting and payments of any amounts found to be due as a result of the accounting, which was not limited in time.  Further, when the discovery in the action uncovered a number of defalcations that occurred prior to 2000, these matters were fully litigated by the parties, and  Sullivan had the opportunity, even at that time, to submit a complete accounting or ask for more time.  Moreover, what must not be lost in all of this is the fact that Sullivan's duty to account arose independent of the filing of this action, particularly given his intermingling and conversions of Trust funds, and is something he was obligated to provide long before this action was filed.

conversions of Trust assets that Sullivan failed to disclose prior to the initiation of this action, along with the many loans to family and friends.

Sullivan argues Anderson is not entitled to further accounting relief for two reasons. Sullivan points first to the fact that Anderson has now had the opportunity for discovery and the fact that she did not retain an expert to conduct a detailed accounting. However, this puts the burden on the wrong foot. Anderson has clearly demonstrated that Sullivan has not only intermingled Trust funds with his own, but also has converted Trust funds for his own uses on multiple occasions. The burden to make an accounting for what happened to the Trust property under these circumstances rests with Sullivan. E.g., Tauber v. Com. ex rel. Kilgore, 562 S.E.2d at 129; see generally 76 Am. Jur. 2d Trusts §§ 281-282 378 (2007).

A second reason given by Sullivan as to why Anderson is not entitled to further accounting relief is the "agreement" he claims he had with Anderson that he would retain a CPA to review the books at the Trust's expense and that Sullivan would reimburse the Trust for any amounts found to be due and owing. The court has already disposed of this argument.

Nevertheless, it appears that there is not much more now to be gained by a further accounting. Anderson has obtained through discovery the financial records of the Trust, such as they are, and appears likely to have uncovered any conversions of Trust funds that  are worth arguing about. Also, by way of discovery, Anderson has had access to a number of other financial records, including those relating to DIA and the condominium, and has been able to successfully trace the flows of money related to a number of the transactions. For these reasons, the court is denying further accounting relief, but the court will consider the fact that Anderson had to obtain her own accounting through discovery in this action in the other relief the court grants.

**4.4     Recovery for converted amounts not traceable to DIA or the Florida condo**

**4.4.1   Entitlement to damages for use of the converted amounts**

One of the things that Anderson discovered through the "accounting" she has received by way of discovery is the fact that Sullivan had made other conversions of Trust assets prior to 2001 that he had not disclosed to her.  At this point, there is no factual dispute about what these amounts are, and Sullivan acknowledges he still owes the money, except he claims an offset related to one accounting item, which the court has denied.  The only issues that remain are what relief Anderson is entitled to receive for these conversions.

For reasons already stated, the pre-2001 converted amounts should not be included as part of the Trust's contribution to DIA, except for the $4,500 that the evidence disclosed was deposited directly into DIA's operating account.  If the court had included the other amounts, the net award to the Trust of the gain from the sale of DIA would have been significantly higher.

Anderson is entitled, however, under N.D.C.C. § 59-01-10 to payment for the value of Sullivan's use of the pre-2001 converted amounts that have not been traced into DIA.  This includes repayment of the principal amount plus an interest component.  Before turning to the specifics of the amounts the Trust is entitled to receive for these conversions, the court will first address the interest component as an element of damages and how the rate of interest should be determined.

**4.4.2   Entitlement to interest as a component of damages**

When a beneficiary elects to recover damages for the value of the use of the converted trust assets, the beneficiary is entitled to interest as a component of the recovery in most states, including North Dakota.  Hill v. Hanna, 222 N.W. at 462-463; see generally Scott at §§ 205-207; Bogert at §§

862-863.  However, there is no uniformity in terms of how the appropriate rate of interest is determined.  See id.

In some jurisdictions, the primary goal is to place the beneficiary in the position the beneficiary would have been in had the trustee performed his duty.  See generally Bogert at § 863.  In these jurisdictions, the courts look primarily to the earnings on the non-appropriated trust assets for determining an appropriate rate of interest.   See id.  But, this may not always be a viable indicator, such as when there are not sufficient other non-appropriated assets, and in these situations other methods for selecting an appropriate proxy must be considered.  E.g., Buder v. Fiske, 174 F.2d 260, 274-275 (8th Cir. 1949).

In other jurisdictions, courts have considered additional factors, including the degree of culpability of the trustee, a desire to insure that the trustee does not benefit from the use of the money in establishing an appropriate rate, and certain legal rates of interest as permitted by state law.  Consideration of these factors has resulted in courts variously imposing:

- Interest at the legal rate, e.g., Barlett and Company, Grain v. Commodity Credit Corporation, 307 F.2d 401, 409 (8th Cir. 1962);

- Interest at the highest rate allowable by law, see e.g., Langford v. Schamburger, 392 F.2d 939 (5th Cir. 1968) (stating that the court would have been inclined to award interest at the legal rate of 6%, but that case law in Texas was clear that interest had to be awarded at the highest legal rate no matter what the circumstances); St. Germain v. Tuttle, 44 A.2d 137, 142 (Vt. 1945) (only when the breach of trust is intentional);

- Interest at the market rate for loans of a similar character and security when the trustee has made a loan to himself, <u>Morrison v. Asher</u>, 361 S.W.2d 844, 852 (Mo. Ct. of App. 1962);

- Interest at an equitable rate as determined on a case-by-case basis after considering a number of factors, including the earnings on other trust assets, the degree of culpability of the trustee, and the rates of interest permitted by law, <u>e.g.</u>, <u>Chisholm v. House</u>, 183 F.2d 698, 709 (10th Cir. 1950); <u>Matthews v. National Surety Corp</u>. 85 A.2d 534, 536 (N.J.Super.Ct. 1952); <u>Malcolm v. Goodhue County Nat. Bank of Red Wing</u>, 274 N.W. 652, 653-654 (Minn. 1937); and/or

- Compound interest when normally only simple interest would be allowed.

<u>See</u> <u>generally</u> <u>Bogert</u> at § 863; <u>Scott</u> at §§ 207.1 & 207.2.

In pretrial briefing both parties cited to the case of <u>Hill v. Hanna</u>, 222 N.W. 459, 463 (N.D. 1928) as establishing a rule that the court must use the "legal rate" of interest under North Dakota law, but disagreed to what "legal rate" statute applies. Anderson argued it should be the post-judgment rate as provided for by N.D.C.C. § 28-20-34, which currently is a variable rate of three percentage points above the prime rate as published by the Wall Street journal rounded up to the next one-half percentage point. Not surprisingly, Sullivan argued it should be the rate set forth in N.D.C.C. § 47-14-05, which provides for a 6% rate of interest on all legal indebtedness unless a different rate is set by contract.

What was at issue in <u>Hill</u>, however, was not the particular rate of interest that was being applied, but rather the trial court's ruling that a trustee who commingles Trust funds with his own is always entitled to a recovery of interest. The North Dakota Supreme Court reversed on that point,

holding there are some instances when interest may not be recovered, and sent the case back for the trial court to determine whether this was one of those cases.  In reaching its decision, the court went on to state that, if the evidence should show that the trustee actually used the intermingled funds, then the trustee should be required to either pay "legal interest" on the moneys used or pay over whatever profit was earned, with the beneficiary having the option of claiming either the profits or the legal interest; but, if the evidence showed only an intermingling with no use, then interest need not be paid if the money was available for use and there was no duty to have invested the money. Id.

The court believes that Hill's passing reference to "legal interest" cannot be construed as firmly adopting the principle that the interest rate to be used as a component of damage for the wrongful conversion of trust property must always be the fixed  "legal rate" of interest (whatever that might be since there are multiple "legal rates" under North Dakota law) for the following reasons:

- The court did not give any guidance as to what it meant by "legal interest" and did not specifically state that it meant "legal rate" of interest.  But, even if this is what the court intended, there is the problem of what rate would be applied since arguments can be made for the statutory rate when the parties have not agreed upon another rate and also the usury rate, which are significantly different.  Further, there is also the issue of whether it has to be one of those rates or whether  it could be a lesser rate if the equities dictate, such as the rate of earnings on other trust assets if that is less.

- The passing reference is mere *dicta* for which the court cited no authority and, more importantly, did not discuss in the context of N.D.C.C. § 59-01-10, which allows recovery for the "value of the use of the trust property" without dictating how that value is to be determined.

- It is by no means clear that the discussion regarding "legal interest" was intended to apply to all situations or just in the context of that case. In particular, it does not appear the facts of the case warranted consideration of other factors, such as the rate of earnings on other trust assets.

- There have been considerable changes in the statutes that govern the charging of interest in North Dakota since the court's decision in 1928.

Rather, the court believes that the North Dakota Supreme Court, when it has the opportunity to fully consider this matter, will follow those jurisdictions which have held that the appropriate rate of interest when awarding the value of the use of the money pursuant to N.D.C.C. § 59-01-10 should be decided on a case-by-case basis based upon the equities involved, with the ultimate goals being: to insure that the beneficiary is fully compensated and, in the more egregious situations, to see that the trustee does not benefit from the use of the money. And, given this determination, the court believes that the factors that are appropriate for the court's consideration in establishing an equitable rate include: the earnings on the non-appropriated trust assets; the egregiousness of the conduct of the trustee; the market rate for loans of a similar character when the trustee has, in effect, made a

loan to himself; and the nominal maximum rate of interest established by N.D.C.C. § 47-14-09 for the use of money, at least as a presumptive ceiling.[35]

### 4.4.3   Award for conversions not traced to DIA or the condo and offsets

Returning to the amounts converted prior to 2001, Sullivan owes the Trust $5,306.59 for the transaction the court has characterized as the "$5,306.59 Transfer for GPS Client." This amount is owed from and after April 7, 1995, and the court will award interest from that date until the amount with interest is offset by amounts paid by Sullivan. Sullivan also owes $9,480.93 for the three royalty checks that were deposited in Sullivan's accounts, one on June 25, 1999, and the other two on December 31, 1999, and that have earlier been lumped together under the category " $9,480.93-Misapplied Royalty Checks." For ease of computation of interest, and since the first check was smaller than the other two, the court will treat all three together as being due and owing as of January 1, 2000, as suggested by Anderson in her brief. Finally, the court concludes with respect

---

[35]   In this situation, the usury rate under N.D.C.C. § 47-14-09 is a more appropriate benchmark than the rate under § 47-14-05, which applies in the absence of an agreement. This is consistent with the more recent North Dakota cases that suggest the former applies to the wrongful "use" of money. E.g., T.F. James Company v. Vokoch, 2000 ND 9, ¶¶ 6-9, 604 N.W.2d 459. It is also consistent with the fact that interest, in this situation, "is really damages, computed in terms of interest." Malcolm v. Goodhue County Nat. Bank of Red Wing, 274 N.W. at 653; see N.D.C.C. § 59-01-10 (requiring as an alternative that the trustee pay "the value of the use of the trust property"); see generally Bogert at § 863 ("Where the trustee has deprived the beneficiary of the use of trust property or its proceeds or products, the value of that use may be estimated by charging interest."). Also, the more recent North Dakota cases have held that § 47-14-05 does not apply when interest is an element of damages. Hart Honey Co. v. Cudworth, 446 N.W.2d 742, 746-747 (N.D. 1989); St. Paul Structural Steel Co. v. ABI Contracting, Inc., 364 N.W.2d 83, 88 (N.D. 1985) (same); but see Hirschkorn v. Severson, 319 N.W.2d 475 (N.D. 1982); cf. Klitzke v. Klitzke, 308 N.W.2d 385, 390 (N.D. 1982) (holding that § 47-14-05 is not a limitation on the court's authority to impose a higher rate to make an equitable distribution of property in a divorce case as commanded by statute).

N.D.C.C. § 47-14-09 establishes the following nominal maximum rate for loans of money:
five and one-half percent per annum higher than the current cost of money as reflected by the average rate of interest payable on United States treasury bills maturing in six months in effect for North Dakota for the six months immediately preceding the month in which the transaction occurs, as computed and declared on the last day of each month by the state banking commissioner, but that in any event the maximum allowable interest rate ceiling may not be less than seven percent . . . .

The State Banking Commissioner's historical month-by-month determination of the usury rates pursuant to this section can be found at North Dakota Department of Finances website.

to both the 1995 and the 1999 conversions, that the appropriate rate of interest to award as a component of the damages is 10% per annum based on the following: the amounts involved were unsecured and carried a significant financial risk; the North Dakota usury rates during the time of the occurrence of the conversions were in excess of 10%;[36] and this is the rate that Sullivan claims he charged for other loans to family and friends during this same time frame.

The court, however, will offset against these amounts the $25,000 reimbursement that Sullivan made to the Trust on April 15, 2002. As of that date, the $5,306.59 that Sullivan owed the Trust since April 7, 1995, had increased to $9,035.74 with simple interest at the rate of 10% (daily interest accrual of $1.4539 * 5665 days). When this sum is subtracted from the $25,000, the 1995 converted amount is fully satisfied. It also leaves $15,964.26 to be credited against the damages owed for the 1999 conversions totaling $9,480.93, which by April 15, 2002, had increased to $11,649.86 with interest at the rate of 10% from and after January 1, 2000, (daily interest accrual of $2.5975 * 835 days). Subtracting these two amounts results in the 1999 converted amounts being satisfied leaving $4,314.40 of the $25,000 payment to be credited against other amounts.

In addition to the foregoing converted amounts, there is also the remainder of the $100,000 January 26, 2001, transfer that the court did not credit toward the Trust's contribution to DIA. As previously noted in the court's findings, the same day Sullivan wrote and deposited the $100,000 Trust check to DIA's account, he wrote on DIA's account a $35,000 check to his personal account, of which $29,000 was used to cover the check he had written on his personal account toward the Florida condominium purchase.

---

[36] The North Dakota usury rate according to tables published by the North Dakota Department of Finance at its website show that rate in April 1995 was 11.451% and that the rate in January 2000 was 10.473%.

The court concludes that $29,000 of the $35,000 can be traced directly toward the purchase of the condominium, particularly given that Sullivan's personal account was near zero and there were no intervening deposits prior to the $29,000 check clearing. This leaves $6,000 that Anderson was not able to trace further. As to this amount, the court will also award interest at the rate of 10% from and after January 26, 2001. The reasons are the same as those expressed for the 1995 and 1999 conversions.[37]

The court will offset against this amount the remaining credit available of $4,314.40 from the April 25, 2002, $25,000 payment. As of April 15, 2002, the $6,000 converted on January 26, 2001, had increased to $6,729.86 with simple interest at 10% (daily interest accrual of $1.6438 * 444 days). Subtracting from this amount the $4,314.40, results in a remaining damage amount of $2,415.46. The court will further offset against that amount the $30,000 paid by Sullivan to the Trust on August 26, 2002. As of that date, the $2,415.46 had increased to $2,502.15 with simple interest at the rate of 10% (daily interest accrual of $0.6618 * 133 days). Offsetting the $30,000 payment results in the remaining $6,000 converted amount on January 26, 2001, being satisfied with $27,497.85 available for further offset.

### 4.5    Additional offset against the Trust's share of DIA sale proceeds

By August 26, 2002, the $31,474 remaining amount of DIA sale proceeds due the Trust, after making the Culligan offsets, had increased to $32,700.19 with simple interest at the rate of 6% (daily interest accrual of $5.1738 * 237 days). The court will credit against this amount the remaining credit available of $27,497.85 from the $30,000 repayment.

---

[37] The North Dakota usury rate for January 2001 was 11.479%.

After this offset, the remaining amount of DIA proceeds due the Trust is $5,202.34.  As of March 23, 2007, this amount had increased to $6,630.49, with interest at 6%. Since there is no evidence that there are any DIA proceeds remaining, the court will award this amount as damages with a daily interest accrual of $0.86 until the entry of judgment.

**.    4.6    Relief for converted amounts traced to purchase of Florida condominium**

**4.6.1    Remedies available and Anderson's option to choose**

In addition to the $29,000 that Sullivan directed to the condominium purchase in January 2001, he converted another $56,716.40 on March 14, 2001, by wire transferring this amount directly from the Trust's account  to a realty company in Florida to come up with the balance that he needed for the purchase of the Florida condominium.  The total amount that Anderson can trace as going directly to the condominium purchase is $85,716.40.

As a matter of law, Anderson can seek a money judgment for the value of the use of the converted funds under the authority previously cited.  Also, she has the option of laying claim to the product of the converted Trust funds, in this case a percentage ownership share of   the condominium, by seeking imposition of a constructive trust.  See, e.g., McMerty v. Herzog, 702 F.2d 127, 130 (8th Cir. 1983)  (applying North Dakota law); Kline v. Orebaugh, 519 P.2d 691, 695-698 (Kan. 1974); see generally  Restatement of Trusts (Second) § 202, 210, 214 (1959); Restatement of Restitution (First) §§ 202 (1937);  Bogert at §§ 865-867.  She must chose one or the other since the remedies are inconsistent.  See id.

Anderson's right to trace the disposition of the Trust funds and seek relief as to the condominium is not limited, however, just to the situation where she chooses to lay claim to the

product of the traced assets.  Anderson is entitled, if she elects the first option of obtaining a money judgment, to seek an equitable lien against the condominium to secure the judgment. See id.[38]

Sullivan argues that his purchase of Culligan and the payments he made to the Trust in 2002 should be used first to offset any amounts that were used to purchase the condominium on the theory that this was what Sullivan intended when he presented his summary of the "outs and ins" showing such an offset, albeit without consideration of interest.  Anderson, on the other hand, is demanding that the conversions of money that Sullivan used to purchase the Florida condominium be addressed separately, because of her right to trace the amounts converted and obtain specific relief with respect to the condominium.

The court agrees with Anderson on this point.  Under the authority previously cited, the law specifically requires that Anderson be given the option of selecting her remedy, and allowing Sullivan to dictate how his repayments are allocated frustrates Anderson's choice of remedy. Further, equity principles support the selection of the option that favors the victim of a breach of a fiduciary duty.

As noted in the court's findings, the Sullivans' contribution toward the purchase of the condominium was $220,000 and that the total purchase price was $300,000.  Further, the evidence is clear that $85,716.40 of the Trust property was diverted to its purchase.  When Sullivan's contribution and the Trust's contribution are added together, the total exceeds the nominal purchase price, and where the additional $5,716.40 went is not clear from the record, although it is possible

---

[38] Restatement of Restitution (First) § 214, cmt. d, illus. 3 (1937) provides the following illustration:
    3. A wrongfully takes $1000 of B's money, and with this money and with $1000 of his own money A purchases Blackacre.  B is entitled at his option to enforce a constructive trust as to a half interest in Blackacre, or an equitable lien upon Blackacre for $1000.

it went to pay costs in connection with the closing or possibly prorated taxes.  In the lack of more definitive evidence offered by Sullivan, who has the burden of sorting out what belongs to him under the authority previously cited, the court will count both the $85,716.40 and the $220,000 as being the contributions of  parties to determine the relative percentage contributions of each, and, when the court does so, the percentage shares are 72% for the Sullivans and 28% to Anderson if she elects to lay claim to an ownership interest in the condominium.

The alternative is a money judgment against Sullivan for the value of the use of the converted funds that can be traced to the condominium with the right to an equitable lien to secure the judgment.  In terms of the amount that Anderson would be entitled to under this option, the court will calculate interest on the $29,000 as running from January 26, 2001, and on the $56,716.40 from and after March 14, 2001.  In terms of an appropriate rate of interest, the court selects the rate of 8% as an appropriate rate based on the following:  the North Dakota usury rate in January 2001 and March 2001 was 11.479 % and 11.079%, respectively;  the risk is reduced given the right to proceed against the Florida condominium; the fact that Sullivan charged the Andersons 7% on the money he borrowed to them from the Ruth Garcia Trust for the purchase of his residence slightly more than a year later and at a time when the interest rates were generally lower;[39] and the interest in seeing that Sullivan does not profit from his use of the money.

Applying the foregoing rate to the $29,000 from and after January 26, 2001, results in a total damage amount as of March 23, 2007, (2247 days) of $41,497.01, with a daily interest accrual of $5.5616.  The same calculation with respect to the $56,716.40, from and after March 14, 2001,

---

[39]   The North Dakota usury rate in August 2002 when the Trust bought Sullivan's house had dropped to 7.637%.

results in a total damage amount as of March 23, 2007, (2200 days) of $80,646.06, with a daily interest accrual of $10.8771. And, combining the sums, the total damage amount as of March 23, 2007 is $122,143.07, with a daily interest accrual until the time of entry of judgment of $16.44 per day.

Anderson has not yet had the opportunity to make the election of whether she wants a percentage ownership interest in the condominium or damages for the value of the use of the Trust money plus an equitable lien to enforce payment. Consequently, it is not possible to enter final judgment until she is given that opportunity.[40]

### 4.6.2   There is nothing in Florida law prohibiting either remedy

Florida law permits the imposition of an equitable lien on property purchased in part with funds obtained through fraud or other egregious conduct. The fact that the property is homestead does not bar the imposition of the remedy provided that the wrongfully obtained funds can be traced directly to the purchase of the homestead. E.g., In re Financial Federated Title & Trust, Inc., 273 B.R. 706, 711-717 (Bkrtcy.S.D.Fla. 2001); Palm Beach Savings & Loan Ass'n, F.S.A. v. Fishbein, 619 So.2d 267, 260-270 (Fla. 1993); cf. Havoco of America, Ltd. v. Hill, 790 So.2d 1018 (Fla. 2001) (discussing past equitable lien cases).[41] Likewise, Florida law also would permit the imposition of a constructive trust allowing Anderson to lay claim to her share of the condominium. E.g., Traub

---

[40] If the court believed it had the discretion to choose, it would select the damage option with the equitable lien. This is much cleaner and any differences between this option and the imposition of a constructive trust granting an ownership share will likely get eaten up in additional attorney fees in attempting to resolve the problems of joint ownership. In particular, there may arguments about the need to make additional adjustments. Sullivan may claim amounts for taxes, insurance, and improvements since the purchase of the condominium, and the Andersons may claim they are entitled to "rent" for the Sullivans' use of their share of the condominium since the time of purchase.

[41] The fact that the homestead may be subjected to equitable relief in this situation is generally accepted. See, e.g., McMerty v. Herzog, 661 F.2d 1184, 1186 (8th Cir. 1981) (applying Minnesota law); see generally Restatement of Trusts (Second) § 202, cmt. d (1959).

v. Traub 102 So.2d 157, 157 -159 (Fla. Dist. Ct. App. 1958); see Williams v. Grogan 100 So.2d 407,

409 -411 (Fla.1958); Saporta v. Saporta, 766 So.2d 379, 381-382 (Fla. Dist. Ct. App. 2000).

### 4.6.3   The court is not barred from granting relief because the condominium is in Florida

Sullivan has argued in pretrial briefs that the court lacks jurisdiction to award any relief with

respect to the Florida condominium.  The court disagrees.  While there may be questions regarding

whether the court's judgment can directly affect title to the Florida property, the court believes there

is other relief the court can grant given that it has jurisdiction over the parties.  See National Bank

of Belfield v. Candee, 488 N.W.2d 391, 396 (N.D. 1992); see generally 27 Am. Jur. 2d Equity § 95

(2007).  The court will allow the parties to further brief the issue of what form this relief should take

depending upon the election made by Anderson.

### 4.7     Request for attorney's fees and costs

#### 4.7.1   North Dakota's application of the "American Rule"

Anderson has requested that the court award her actual attorney's fees and costs, but cites

no North Dakota authority for such an award.  North Dakota follows the "American Rule," which

generally provides that attorney's fees are not recoverable except as authorized by contract or

statute.  Deacon's Development, LLP v. Lamb, 2006 ND 172, ¶10, 719 N.W.2d 379 (N.D. 2006);

Anderson v. Selby, 2005 ND 126, ¶17, 700 N.W.2d 696 (N.D. 2002) (denying attorney fees in a

reformation action); Olson v. Fraase, 421 N.W.2d 820, 828-829 (N.D. 1988); N.D.C.C. § 28-26-

01(1) ("[T]he amount of fees of attorneys in civil actions must be left to the agreement, express or

implied, of the parties.").

Some jurisdictions that follow the "American Rule" make an exception in Trust actions and

allow recovery of attorney fees in this situation.  E.g., Dardovitch v. Haltzman, 190 F.3d 125, (3rd

Cir. 1999) (citing cases from other jurisdictions and treatise authority).   However, the court could find no North Dakota cases allowing such an exception and, to date, the North Dakota Supreme Court has not shown any indication of allowing equitable exceptions to the "American Rule," which is established by statute. N.D.C.C. § 28-26-01(1).  Further, the court notes that the North Dakota Legislature has spelled out in detail the rights and remedies of a beneficiary against a trustee who breaches his fiduciary duties, but has made no provision for recovery of attorney fees.  Many of these statutes have already been cited in this case.  And, all of these statutes, including the one adopting the "American Rule," are of long-standing. Consequently, the implication is that the Legislature has "intended" that the "American Rule" be followed in cases such as this.  For these reasons, the court concludes that North Dakota law does not permit the recovery of attorney's fees in this case.

### 4.7.2   Recovery of fees and costs incurred in pursuit of converted assets

North Dakota's law that defines what damages are recoverable in an action for the conversion of personalty, however, does allow as a substantive element of damage "fair compensation for the time and money properly expended in the pursuit of the property."  N.D.C.C. § 32-03-23.  The North Dakota Supreme Court has held that this statute was not intended to abrogate the "American Rule" and provide recovery of attorney fees generally.  Harwood State Bank v. Charon, 466 N.W.2d 601, 605-606 (N.D.1991).  The court did state, however, that there might be some attorney fees that may be incurred, both for the purpose of pursuing the litigation and in pursuit of the property, and gave some examples of fees that might provide a basis for recovery. More specifically, the court stated the following:

> Accordingly, courts have distinguished between time spent in pursuit of converted property, and time spent in pursuit of litigation. Time and money spent in an effort

to recover converted property have included hauling charges, temporary storage charges and travel expenses incurred while searching for the property. <u>Lothrop v. Golden</u>, 57 P. 394 (Cal.1899). Time spent in pursuit of litigation has included attorney's fees for the preparation of a conversion action, and furthering the criminal prosecution of the converter. <u>Haines v. Parra</u>, <u>supra</u>. It is possible that time and money spent could serve both purposes, and some expenses connected with litigation may be compensated if a purpose related to the recovery of the actual property is demonstrated. <u>Gladstone</u>, <u>supra</u>. For instance, the <u>Gladstone</u> opinion suggests that attorney time spent preparing lists of missing property, inspecting inventories, meeting with the converter, contacting law enforcement officers, and making inquiries regarding courses of action appropriate to recovering the converted property could have a demonstrable purpose independent of litigation. Here, the Bank merely submitted a bill for attorney's fees, and no effort was made to demonstrate a purpose other than the recovery of damages. Consequently, we reverse the award of attorney's fees.

<u>Id.</u> Presumably, the same justification may apply to costs that are not otherwise recoverable to a prevailing party.

In this case, Anderson attempted to offer proof of her attorney's fees and, when that point was reached, everyone agreed the issue of attorney's fees would be deferred until after the court determined whether or not there was going to be any liability on the part of Sullivan. Consequently, the court will permit Anderson to make a request for attorney's fees and costs that fit within the scope suggested by the North Dakota Supreme Court in <u>Harwood State Bank</u> if she is able to do so.

### 4.7.3   Recovery of statutory fees and costs

In addition to any fees and costs that are recoverable in pursuit of the converted assets, the court determines that  Anderson is the prevailing party and is entitled to the statutory fees and costs that are taxable in a federal civil action as to Sullivan only and not Nancy Sullivan.

### 4.8      Request for punitive damages

North Dakota law requires  proof by clear and convincing evidence of  oppression, fraud, or actual malice for an award of punitive damages.  N.D.C.C.  § 32-03.2-11(1).   Further, any award must be consistent with the principles and factors set forth in § 32-03.2-11(5).

In this case, Anderson has more than met her statutory burden of proving fraud.  By law, Sullivan's breaches of his fiduciary duties in violation of N.D.C.C. §§ 59-01-09, 59-01-10, 59-01-12, 59-01-15 are *per se* fraud under N.D.C.C. § 59-01-15.  Further, even putting this aside, Sullivan clearly suppressed facts that he should have made known to Anderson, including his commingling of Trust assets with his own.  While he later disclosed that he had used some of the funds, this was long after the fact and even this disclosure was incomplete.  Further, the court has concluded that the "protective purpose" explanation given by Sullivan to Anderson for the 2001 conversions was simply a pretext to cover his real motivations.  Any of these misrepresentations also would be grounds for finding fraud.  See, e.g., Dewey v. Lutz, 462 N.W.2d 435, 440-441 (N.D. 1990); NDJI Civil C - 72.12.

In terms of the factors the court must consider under § 32-03.2-11(5) in deciding whether to award punitive damages and how much, the court  notes, in particular:  that  Sullivan profited from his wrongful conduct - particularly with respect to his use of the Trust money which assisted him in growing and selling DIA for substantial gain; the reprehensibility of his  conduct as measured by the law's insistence that persons in positions of trust not violate their responsibilities; the long duration of the conduct; and the court's concern that Sullivan may not yet "get it" in terms of the impermissibility of his self-dealing in the Trust assets as indicated by his trial testimony.  All of these factors support an award of punitive damages.

On the other hand, there are other factors that, at the very least, are mitigative and include: the friendship and comfort that Sullivan provided to Anderson over the years; the assistance provided by Sullivan with respect to Anderson's financial affairs, which was not all bad and which is now without any remuneration given the court's other action as discussed below; the fact that Sullivan intended to eventually make good on his defalcations; and the fact Sullivan made substantial repayments prior to any complaint or threat of suit.

After balancing these factors, the court believes that some award of punitive damages would be warranted for the purposes of ensuring that Sullivan has not profited by his conduct and for imposing punishment, but for the court's award of a share of the gain from DIA and to a lesser extent the denial of trustee fees, which have largely satisfied these purposes. Hence, the court elects not to award punitive damages.

### 4.9    Request for award of treble damages

Anderson also asks the court to treble the amount of damages being awarded by applying the provisions of N.D.C.C. § 27-13-08. The court concludes, however, that Sullivan's conversions of Trust funds were made while Sullivan was acting in his trustee capacity and not as an attorney. Consequently, Anderson is not entitled to recover treble damages.

### 4.10    Relief as to Nancy Sullivan

Anderson is not entitled to a monetary judgment against Nancy Sullivan personally. The evidence is insufficient to show that she participated in the conversions of Trust funds for which monetary relief is being granted. Anderson, however, is entitled to equitable relief against Nancy Sullivan with respect to the Florida condominium.

The parties have argued over whether Nancy Sullivan knew that Trust funds were used for the down payment as of the date of closing. For the reasons set forth in the court's findings, the court concludes Nancy Sullivan had constructive, but not actual knowledge on the date of closing. Further, the court has found that she obtained actual knowledge within a very short period of time after the closing.

But, even a finding of mere constructive knowledge is not a prerequisite to Anderson's right to claim an equitable lien upon the Florida condominium. This is because Florida law supports the imposition of such a lien under the circumstances presented by this case either to prevent Nancy Sullivan from being unjustly enriched or upon the theory that she was not give value for (and hence cannot be a bona fide purchaser for value) at least to the extent of the down payment money that came from converted Trust funds.[42] See In re Financial Federated Title & Trust, Inc., 273 B.R. at 716-717; Fishbein, 619 So.2d at 270-271. Moreover, Florida's law is not unique in this regard. See, e.g., In re Marriage of Allen, 724 P.2d 651, 658-660 (Colo. 1986); Orevaugh v. Kline, 519 P.2d 691, 214 (Kan. 1974); Cross v. Cross, 246 S.W.2d 801, 803 (Mo. 1952); American Ry. Exp. Co. v. Houle, 210 N.W. 889, 890 (Minn. 1926); Clingman v. Hill, 215 P. 1013 (Kan. 1923). Likewise, although it may not be quite as clear, it appears that a constructive trust awarding an ownership share of the condominium can also be granted regardless of Nancy Sullivan's knowledge for the same reasons,. See Namow Corp. v. Egger, 668 P.2d 265 (Nev. 1983); see id.

---

[42] Clearly, Nancy Sullivan did not give anything of value for the more than $80,000 of Trust money that went to the down payment. Further, although she co-signed a note and mortgage with Sullivan for financing the balance, the credible evidence is that she became aware of the Trust's interest within a short time after the purchase and made no effort to restore the property. This further supports the award of equitable relief, and there is some authority that subsequent knowledge of the use of the Trust money and failure to restore the money could also subject her to personal liability. See Cross v. Cross, 246 S.W.2d 801, 803 (Mo. 1952).

In this case, this is all somewhat academic since the court has concluded that Nancy Sullivan had constructive knowledge of use of Trust funds for the down payments at the time of closing. Under the law, this is enough to deny her any claim that she was a bona fide purchaser. See generally Bogert at §894.

## 5.0   Sullivan's counterclaim

### 5.1   Counterclaim for trustee's fees

Sullivan has counterclaimed for an award of trustee's fees.  The court will make no award of fees for the following  reasons:  the extent, duration, and the nature of Sullivan's conversions of Trust funds for his own personal gain; the self-satisfaction he obtained, if nothing else, by his use of the Trust as his personal slush fund to make loans to family and friends; and the fact that the court cannot be assured based on the poor condition of the Trust's record keeping, and apparent lack of records, other than the Quickbooks electronic records, that all of the money he handled has been accounted for coupled with the Sullivan's failure to make a sufficient accounting.  See, e.g., Traub v. Traub, 135 So.2d 243, 244-245 (Fla. Dist. Ct. App. 1961);  Bogert at § 861.

### 5.2   Counterclaim for un-reimbursed expenses

Sullivan also seeks recovery of expenses he incurred on behalf of the Trust or Anderson that were un-reimbursed as of the date he was terminated as a trustee by state court action.   The court will award those un-reimbursed expenses as detailed in the court's findings, which total $9,380.41, without interest, and will offset those amounts against the amounts due Anderson as determined by the order for entry of final judgment.

### 5.3    Counterclaim for attorney's fees and costs

Sullivan's request for actual attorney's fees and costs on the grounds that Anderson's claims are frivolous is without merit.  Likewise, also without merit is Sullivan's claim for reimbursement from the Trust for the costs and fees incurred in defending this  action given his his breaches of his fiduciary duties and the self-dealing, not to mention his attempts to justify the indefensible.  See Vazquez v. Goodrich, 206 So.2d 54, 55 (Fla. Dist. Ct. App. 1968).

### ORDER

Based on the foregoing findings of fact and conclusions of law, it is hereby **ORDERED** as follows:

1. Anderson shall within fifteen days of the date of this order file an election regarding what relief she seeks with respect to the conversions of Trust property traceable to the Florida condominium consistent with the court's conclusions of law that she must elect between a claim of an ownership interest protected by a constructive trust or money damages for the wrongful use of the Trust funds secured by an equitable lien. Anderson shall also within fifteen days  brief the issue of what specific form of relief the court should grant given any limitations upon the court's power to order relief with respect to the Florida condominium.  Sullivan may file a responsive brief within fifteen days of the filing of Anderson's brief.

2. Anderson shall submit to the court and serve upon Sullivan within fifteen days of this order a listing of all attorney's fees and other costs that Anderson claims have been expended in pursuit of the converted Trust assets consistent with the court's conclusions of law, supported by backup documents evidencing the expenditure of

the fees and costs, and Sullivan shall have fifteen days from the date of Anderson's filing to file any objections.  Thereafter, the parties shall have five days to request a hearing, which will be upon argument only unless the party has made a specific request for an evidentiary hearing.  Following the same procedures and deadlines, Anderson shall submit her request for award of statutory fees and costs, supported by backup documents evidencing the expenditure of the fees and costs, and Sullivan shall make his response.  Thereafter, the parties shall have five days to request a hearing, which will be upon argument only unless the party has made a specific request for an evidentiary hearing.

3.  The court will enter a supplemental order granting the final relief and ordering entry of judgment consistent with the foregoing findings of fact and conclusions of law when it becomes appropriate to do so.

4.  This is not a final order.  The court retains jurisdiction to resolve the remaining issues and the clerk is instructed not to enter judgment until ordered to do so by the court.

5.  The court's prior order of October 6, 2006, enjoining the Sullivans from taking certain actions with respect to the Florida condominium remains in effect.

Dated this 28th day of March, 2007.


/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge